RICHARD PRY, Plaintiff-Appellee, v. THE ALTON AND SOUTHERN RAILWAY COMPANY, Defendant-Appellant.

Fifth District   No. 5—91—0520

Opinion filed August 25, 1992.

James C. Cook, of Walker & Williams, P.C., of Belleville, for appellant.

Kujawski & Faerber, P.C., of Belleville, and Jeanne Sathre, of Edwardsville (Fritz G. Faerber, of counsel), for appellee.

JUSTICE WILLIAM A. LEWIS delivered the opinion of the court:

Plaintiff, Richard Pry, filed a complaint in the St. Clair County circuit court on November 7, 1986, pursuant to the Federal Employers' Liability Act (FELA) (45 U.S.C. §§51 through 60 (1982)), against the defendant, Alton & Southern Railway Company, for a work-related injury to his left knee on May 24, 1984. The defendant's motion to dismiss was denied, and subsequently, the defendant filed its answer and affirmative defenses, one of which was that the plaintiff had compromised and settled his claim for this injury when he signed a release on June 7, 1985. Following a jury trial on the plaintiff's complaint, the jury found for the plaintiff and against the defendant and awarded the plaintiff $650,000 in damages. The defendant appeals.

On appeal, the defendant raises numerous issues. The defendant alleges that: (1) the Railway Labor Act (45 U.S.C. §§151 through 160 (1982)) was applicable and preempted the circuit court's jurisdiction over the plaintiff's FELA cause of action; (2) the circuit court erred in refusing to submit the defendant's special interrogatory to the jury pursuant to section 2—1108 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1108); (3) the plaintiff's complaint was barred by FELA's three-year statute of limitations; (4) the court erred in allowing the plaintiff to amend his complaint during trial to include a count under the Safety Appliance Act (45 U.S.C. §§1 through 16 (1982)) and in giving the jury corresponding instructions under the Safety Appliance Act; (5) the court erred in barring medical testimony of the plaintiff's preexisting coronary artery disease; (6) the court erred in admitting medical evidence of the possibility of future surgical replacement of the plaintiff's left knee; (7) the evidence was insufficient to support a jury verdict under FELA and under the Safety Appliance Act; and (8) the jury's verdict was excessive and in-

dicated that the jury was motivated by passion and prejudice. We affirm for the reasons set forth below.

At trial, the plaintiff testified he had worked for the defendant since May 16, 1963, primarily as a switchman, but he had spent three months as a yardmaster. As a switchman, his duties consisted of uncoupling and coupling railway cars. The plaintiff explained that some railway cars coupled on contact, but when this failed to occur, a switchman had to go between the cars and couple them manually.

On May 24, 1984, two cars failed to couple because of a misaligned drawbar, requiring the plaintiff to step between the cars and realign the drawbar. The plaintiff informed the yardmaster that he had a misaligned drawbar, and the yardmaster advised the plaintiff to straighten it by any method available. To move the misaligned drawbar, the plaintiff first exerted normal pressure, but when this attempt failed, the plaintiff braced his feet against the rail, placed his back against the drawbar, and pushed and lifted the drawbar. According to the plaintiff, this method was one he had been shown when he was trained as a switchman. When the plaintiff realigned the drawbar, it felt as though something burned in his left knee. The plaintiff reported the incident to the trainmaster, and the trainmaster removed him from his switchman duties and assigned him to tasks on the engine for the remainder of the plaintiff's shift. The plaintiff's shift as a switchman was from 7 or 7:30 a.m. to 3 or 3:30 p.m.

The plaintiff did not report to work the following day because his left knee caused him too much pain, but he did report to work the next day, May 26, 1984. When the plaintiff attempted to work, the pain in his knee became too great, and he was taken to the emergency room of Memorial Hospital, where he was examined, given pain medication, and released. Subsequently, the plaintiff sought treatment from his family doctor, Dr. Hipskind, who kept him off work for a few days. The plaintiff returned to work, but his left knee continued to cause him pain. When his knee did not improve, Dr. Hipskind referred the plaintiff to Dr. William Simmons.

Dr. Simmons determined the plaintiff had a tear in his knee and performed arthroscopic surgery. Following this surgery, the plaintiff developed an infection which did not respond to medication, prompting Dr. Simmons to perform further surgery. The plaintiff returned to work on April 4, 1985.

When Dr. Simmons released the plaintiff for work, the defendant sent him to its doctor for a return-to-work physical. The defendant's doctor also released the plaintiff for work, and he resumed his duties as a switchman.

The plaintiff further testified that, following his accident of May 24, 1984, he had numerous discussions with G. Jim Miller, the defendant's claims man. On June 7, 1985, the plaintiff and Miller executed a release for the injury to his left knee sustained on May 24, 1984. In exchange, the plaintiff received $90,450, minus deductions for advances. At the time they signed the release, the plaintiff was working. The plaintiff planned to continue working, as he had children in high school and grade school. The plaintiff stated that he and Miller considered the plaintiff's settlement a good one since the plaintiff could continue to work. The plaintiff was not represented by an attorney when he discussed or executed the release.

The plaintiff continued to work; however, his left knee began to "give out" on him occasionally. When this occurred, he suffered no ill effects. Near the end of September 1985, as the plaintiff climbed the steps of the defendant's office building, his knee gave out on him, causing him to fall. The plaintiff caught himself with his hands, but he did not injure himself. The plaintiff saw Dr. Simmons following this incident, and the doctor took him off work through October. When the doctor released him for work on November 4, 1985, he was required to wear a knee brace when he worked. The defendant again had the plaintiff see its doctors for a return-to-work physical. Subsequently, Miller advised the plaintiff that the defendant's doctors refused to let the plaintiff return to work while wearing a knee brace due to safety considerations. The plaintiff had not worked for the defendant since October 1, 1985.

The plaintiff admitted Miller and Robert Heath had talked to him about accepting a yardmaster's position with the defendant. As a yardmaster, the plaintiff could sit to work, where as a switchman, his duties required him to walk and to jump on and off railway cars. The plaintiff testified that Heath and Miller discussed the yardmaster position with him in late August or early September 1985, before he was medically disqualified from work by the defendant's doctors. The plaintiff indicated he would consider the yardmaster job; however, he subsequently refused the position as he did not want the aggravation of the job. If the plaintiff took the yardmaster position, he would be on the "extra board," i.e., he would be on call and work only when needed. There would also be 25 to 30 people ahead of the plaintiff on the "extra board," and consequently, he might work as little as once a week or once a month. Furthermore, the plaintiff's seniority as a switchman would not transfer to the yardmaster position. The plaintiff stated that he worked only the day shift as a switchman, but as a yardmaster, he would be required to work other shifts as well.

According to the plaintiff, after he was medically disqualified from his employment, he asked Miller if he could work as a yardmaster. The plaintiff was led to believe that he was totally disqualified from working for the defendant.

The plaintiff testified on cross-examination that he has not had surgery on his left knee since he returned to work in April 1985. The plaintiff's knee continues to hurt, he wears a brace, and he does not fall. The plaintiff was unaware of the possibility of future surgery on his knee if his condition worsened. He admitted he had signed the release for the defendant freely and voluntarily, and that he understood that, when he signed the release, he was compromising his claim against the defendant. Miller had told the plaintiff that if a settlement was "over six figures," the plaintiff would "sell his job."

G. Jim Miller (Miller), the defendant's former claims man, testified that he investigated the plaintiff's accident of May 1984. He corroborated the plaintiff's testimony that he injured his left knee on May 24, 1984, while moving a misaligned drawbar so that two railcars could couple. He also confirmed that the plaintiff had to go between two cars and push the drawbar, which moved horizontally, to effect the coupling.

Miller negotiated the settlement of the plaintiff's claim for his knee injury. Miller concluded that the defendant was liable under FELA and the Safety Appliance Act for the plaintiff's injuries. Miller also considered the nature of the injury, the treatment of the injury, and how long the plaintiff was off work to determine the amount of the settlement. He calculated the plaintiff's lost wages for his time off work to be between $23,000 and $30,000. Miller knew the plaintiff had returned to work in April 1985 and admitted that one of the factors considered in reaching the settlement was that the plaintiff would continue to work. According to Miller, the defendant had a "rule" that if the defendant paid six figures (such as $150,000), the defendant usually asked for the person's resignation.

Miller became aware the plaintiff was again off work after the settlement when Dr. Rouse's office (one of the defendant's doctors) called on November 15, 1985, and advised him that the plaintiff could not work while wearing a knee brace. Dr. Rouse had performed a return-to-work physical on the plaintiff after he was off work for 30 days in October 1985. Dr. Rouse did not send any documents refusing plaintiff's return to work, but Miller received a report from Dr. Shaw stating the plaintiff could not work while wearing a knee brace because of safety considerations. Dr. Shaw left the final decision of whether the plaintiff could return to work to Dr. Rouse. Miller called

the plaintiff on November 18, 1985, and advised the plaintiff that Dr. Rouse refused to let him return to work.

In contrast to the plaintiff's testimony, Miller testified that he and the plaintiff talked to Robert Heath about the yardmaster position in December 1985, after Dr. Rouse refused to permit the plaintiff to return to work. It was Miller's opinion the plaintiff could do the yardmaster job while wearing his knee brace, since this position enabled the plaintiff to sit, where a switchman's job required more physical activity. The yardmaster job also paid more than a switchman. According to Miller, the plaintiff considered the yardmaster job for a couple of days, but then refused the position because he was tired and he did not want to work. On cross-examination, Miller admitted he lacked the authority to hire the plaintiff as a yardmaster, and it was the superintendent who made this decision.

Dr. Leroy Grossman, a professor of economics at St. Louis University, testified that the plaintiff's actual lost wages for the period he was off work, from October 1985 to the date of the trial (May 1991), were $168,859. Based upon the assumption that the plaintiff could no longer work, Dr. Grossman testified that the present cash value of the plaintiff's future lost wages would be $75,642 if the plaintiff retired at 62 years of age, or $162,773 if the plaintiff retired at 65 years of age. Thus, the plaintiff's total lost wages were $244,501 or $331,632, depending on which retirement age was used.

Two evidence depositions were admitted into evidence. Dr. William Simmons, an orthopedic surgeon, testified in his evidence deposition that he first saw the plaintiff on July 17, 1984. Dr. Simmons related the history of the plaintiff's knee injury and his treatment of the plaintiff's condition, which he diagnosed as a tear of the medial knee cartilage (medial meniscus). Dr. Simmons performed arthroscopic surgery on the plaintiff's left knee on July 30, 1984, and subsequently, the plaintiff developed an infection. When the plaintiff's knee failed to heal properly, Dr. Simmons surgically removed the complete meniscus from the inside of the knee. Dr. Simmons released the plaintiff for work in April 1985.

Dr. Simmons next saw the plaintiff in late September 1985. At that time, the plaintiff complained of pain and of his knee catching, which had been occurring for the past two months. Dr. Simmons injected the plaintiff's knee with a steroid, and the plaintiff returned to work. The plaintiff saw the doctor again in early October 1985. Dr. Simmons examined the plaintiff and found that he was unable to fully extend his left knee. X rays taken at that time revealed that the plaintiff had mild degenerative changes inside the knee joint, caused

by the removal of the meniscus and a common result of this type of surgery.

When Dr. Simmons returned the plaintiff to work in April 1985, he thought the plaintiff had reached his maximum recovery; however, the plaintiff's condition worsened between April 1985 and June 1990. Dr. Simmons testified that the plaintiff's degenerative osteoarthritis caused pain and instability in the knee and was related to the injury of May 24, 1984. It was Dr. Simmons' opinion that, as of June 21, 1990, the plaintiff was not capable of performing his job of switchman because of the changes in the knee joint.

Dr. Edward Shaw, one of the defendant's doctors at Barnes-Sutter Health Clinic, testified in his evidence deposition that on November 4, 1985, he did the plaintiff's return-to-work physical examination for the defendant. Dr. Shaw knew that the plaintiff had been released for work by his doctor, but that he was required to wear a knee brace. Dr. Shaw's examination revealed that the plaintiff's left knee was fine, but because of the knee brace requirement, it was his opinion that the plaintiff should not return to work due to safety considerations.

The defendant's only witness was Robert Heath. Heath testified he was employed by the defendant as a superintendent in 1984 and 1985. Heath had authority to hire the plaintiff as a yardmaster, and he recalled that Miller and the plaintiff came into his office and inquired about a yardmaster job on the "extra board." Miller told Heath that Dr. Rouse refused to let the plaintiff work because the plaintiff had to wear a knee brace. Heath asked the plaintiff if he was interested in the job, and the plaintiff responded that it was possible, but he wanted to discuss it with his wife. Heath subsequently learned that the plaintiff had refused the job.

Before the plaintiff refused the job, Heath contacted Dr. Rouse's office to inquire if the plaintiff was medically fit to do the yardmaster job. Dr. Rouse was not in, and the doctor's secretary told Heath that the doctor would have to "clear it" when he returned. Heath stated that he "could have probably persuaded Dr. Rouse to allow Mr. Pry [the plaintiff] to work." Heath did not contact Dr. Rouse after the doctor returned because the plaintiff had refused the yardmaster position.

Heath explained that there are regular yardmasters, and when a regular yardmaster wants time off, a yardmaster on the "extra board" fills in for the regular yardmaster. Heath confirmed that a person on the "extra board" never knows what shift he is going to work, but that a person on the "extra board" gets "lots of work."

At the close of the evidence, the jury found for the plaintiff and against the defendant and awarded the plaintiff $650,000 damages. The court entered judgment on the jury's verdict, and, subsequently, adjusted the verdict by giving the defendant credit for the $90,450 paid to the plaintiff pursuant to the settlement agreement.

The defendant's first argument on appeal is that the plaintiff has presented an "artful pleading," in that he couched his complaint as a FELA action when actually the plaintiff's claim was a "minor dispute" over the loss of the plaintiff's employment with the defendant. Since it was a "minor dispute," the defendant contends the plaintiff's complaint was a grievance subject to the exclusive jurisdiction of the Railway Labor Act (RLA) and the State court's jurisdiction was preempted. We disagree.

■■ The purpose of the FELA is to provide a Federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer, and the coverage of the statute is defined in broad language which has been construed even more broadly. (*Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410.) In contrast, the purpose of the RLA is to provide a comprehensive framework for the resolution of labor disputes in the railroad industry, *e.g.*, the resolution of disputes over the formation of collective bargaining agreements (major disputes) and the resolution of the interpretation and application of a collective bargaining agreement (minor disputes) in order to avoid labor strikes and the interruption of interstate commerce. (*Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410.) Here, the plaintiff's complaint set forth that the plaintiff was seeking recovery for his injury to his left knee sustained as a result of the defendant's negligence. The plaintiff sought damages for the permanent injury to his knee, for past and future pain and suffering, and for permanent disability, as well as for loss of his gainful employment. The plaintiff's injury and the plaintiff's resultant losses clearly were compensable under FELA, and the plaintiff's cause of action comes under the provision of this Federal statute.

Further, although FELA actions and RLA actions might overlap, the fact that an injury is compensable under FELA and may be subject to arbitration under the RLA does not deprive an employee of the right to bring an action under FELA. (*Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410.) Here, the plaintiff was not contesting the defendant's finding him physically unfit for work; rather, he presented the evidence of his loss of employment as damages resulting from his knee injury. Evi-

dence of an employee's physical fitness to return to work admitted at trial was held to be proper in *York v. Grand Trunk Western R.R. Co.* (1979), 71 Ill. App. 3d 800, 390 N.E.2d 116, where the court concluded that the lost employment was not a "minor dispute" under the RLA but was a portion of the plaintiff's damages under his FELA action. We find the same to be true in the instant case, and the plaintiff's complaint was not preempted by the RLA but presented a cause of action which was subject to the circuit court's jurisdiction, since a FELA action can be brought in State court or Federal court, at the plaintiff's election. *Castro v. Chicago, Rock Island & Pacific R.R. Co.* (1980), 81 Ill. App. 3d 233, 401 N.E.2d 5, *rev'd on other grounds* (1980), 83 Ill. 2d 358, 415 N.E.2d 365.

In addition, while the defendant contends that this was a "minor dispute" under a collective bargaining agreement and subject to the exclusive jurisdiction of the RLA, the defendant failed to provide any evidence of this. The defendant's assertion is conclusory and speculative and unsupported by the record presented on appeal.

The defendant's next contention is that the circuit court erred in refusing to submit its special interrogatory to the jury, in violation of section 2—1108 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1108.) The defendant argues that, under the statute, when special interrogatories are requested by a party, submission of the interrogatories to the jury is mandatory and the circuit court has no discretion to refuse the interrogatories.

The special interrogatory tendered by the defendant stated:

"Do you find from the evidence that the plaintiff's claim for injuries and damages sustained on May 24, 1984, was settled and released with plaintiff's execution of the release dated June 7, 1985, and acceptance of $90,450.00 from defendant?"

The defendant argues that this interrogatory should have been submitted to the jury, as a positive answer to this question would have defeated the plaintiff's claim entirely. We disagree.

■■ The statute delineating the law on special interrogatories states that "[s]pecial interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1108.) The case law further states that special interrogatories are used to test the general verdict against the jury's opinion as to one or more specific questions of an ultimate, material fact. (*Noel v. Jones* (1988), 177 Ill. App. 3d 773, 532 N.E.2d 1050.) Generally, a court has no discretion to refuse a special interrogatory; however, a court may refuse to submit a special interrogatory if it is not in proper form. (*Noel*, 177 Ill. App. 3d 773, 532

N.E.2d 1050.) "A special interrogatory is in proper form if it relates to an ultimate question of fact upon which the rights of the parties depend [citation], and an answer responsive thereto might be inconsistent with a general jury verdict." (*Noel*, 177 Ill. App. 3d at 783, 532 N.E.2d at 1056.) In the instant case, the special interrogatory tendered by the defendant was not in proper form.

■ The question presented by the defendant's special interrogatory, if answered positively, would not have been inconsistent with the jury's general verdict. The plaintiff admitted that he signed a release for his claim against the defendant for his injuries incurred on May 24, 1984. In the burden of proof instructions given to the jury, the court instructed the jury that the defendant had raised the affirmative defense of the release as a bar to the plaintiff's claim, but that the plaintiff denied that the release was valid. The court further instructed the jury that if the jury found that the release was executed under a mutual mistake of fact, then the release was not valid and the plaintiff's claim was not barred. When the jury found for the plaintiff, it determined that the release executed by the plaintiff was not valid and did not bar the plaintiff's claim.

The defendant's special interrogatory inquired about whether the release signed by the plaintiff "settled and released" the plaintiff's claim, but the interrogatory failed to inquire into the release's validity when it was executed. The plaintiff never denied executing the release, and the language of the release itself stated that the plaintiff settled and released his claim. Therefore, there was no question about the execution of the release. The ultimate, material fact presented to the jury was whether there was a mutual mistake of fact which would invalidate the release, and the defendant's special interrogatory as presented was incomplete. Since the defendant's special interrogatory was not in proper form, the court's refusal to submit the interrogatory to the jury was not error.

The third argument made by the defendant is that the plaintiff's cause of action is barred by the three-year statute of limitations applicable to FELA actions. (45 U.S.C. §56 (1982).) The defendant contends that the plaintiff's injuries occurred on May 24, 1984, but in the plaintiff's original complaint, he alleged that his injuries accrued "on or about May 15, 1984." It was not until June 30, 1987, more than three years after the incident, that the plaintiff amended his complaint to reflect the correct date of his injuries. It is the defendant's position that this amendment concerned a material element of the offense, and that the amendment raised a new cause of action, and

thus, since the amended complaint was filed after the statute of limitations had run, the plaintiff's complaint was time barred.

As was stated previously, a plaintiff has the right to bring a FELA complaint in either Federal or State court. (*Castro*, 81 Ill. App. 3d 233, 401 N.E.2d 5.) If a plaintiff elects to proceed in the State court, the procedure is regulated by State law. (*Castro*, 81 Ill. App. 3d 233, 401 N.E.2d 5.) Therefore, since the amendment of a complaint is a procedural issue, we must apply Illinois law.

Section 2—616(b) of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—616(b)) is applicable to our analysis. This section provides as follows:

"The cause of action *** set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery or defense asserted, if the condition precedent has in fact been performed, and for the purpose of preserving the cause of action, cross claim or defense set up in the amended pleading, and for that purpose only, an amendment to any pleading shall be held to relate back to the date of the filing of the original pleading so amended." (Ill. Rev. Stat. 1991, ch. 110, par. 2—616(b).)

It is clear from the statute that, under certain conditions, an amended pleading can relate back to the original complaint, effectively barring an application of a statute of limitations.

■ The case law has established that an amended cause of action can relate back even if the original pleading did not technically state a cause of action or if the amended pleading is not substantially the same as that stated in the original pleading. (*Williams v. Board of Education* (1991), 222 Ill. App. 3d 559, 584 N.E.2d 257.) Where the amended pleading is filed after the expiration of the limitations period, the cause of action alleged in the amended pleading will relate back if two requirements are met: (1) the original pleading was timely filed, and (2) the original and the amended pleading indicated that the

cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading. (*Wolf v. Meister-Neiberg, Inc.* (1991), 143 Ill. 2d 44, 570 N.E.2d 327.) It is the defendant's burden to show that the amendment hindered his ability to present a case on the merits in order to prevent the amended pleading from relating back. (*Williams*, 222 Ill. App. 3d 559, 584 N.E.2d 257.) Even if the amendment differs materially from the original complaint, the court will not find prejudice and the amendment will relate back if it is shown that the defendant was put on clear notice of the facts included in the amendment prior to the running of the limitations period. (*Williams*, 222 Ill. App. 3d 559, 584 N.E.2d 257.) Here, the amended pleading filed by the plaintiff after the running of the three-year statute of limitations met the foregoing criteria.

■ In the plaintiff's original complaint filed on November 7, 1986, well within the three-year limitations period, the plaintiff alleged that "on or about May 15, 1984" he injured his left knee while employed by the defendant as a switchman, that he was injured in the course of his duties as a switchman at the defendant's East St. Louis railroad yard, and that the defendant's negligence was the proximate cause of his injuries. The plaintiff alleged specifically that his left knee was injured when he attempted to move a defective drawbar. The plaintiff's amended complaint, filed pursuant to court approval on June 30, 1987, after the expiration of the statute of limitations, stated the same exact facts as the original complaint with the exception that the date of the incident was changed to read "May 24, 1984." The amended complaint filed by the plaintiff did not prejudice the defendant, and the defendant knew from the facts alleged in the original complaint and in the amended complaint that the cause of action arose out of the same transaction.

Further, the record in this case indicates that the defendant knew before the expiration of the limitations period that the correct date of the incident was May 24, 1984. Attached to defendant's amended motion to dismiss filed on December 1, 1986, was a copy of the signed release which gave May 24, 1984, as the date of plaintiff's injuries. Similarly, in the defendant's answers to the plaintiff's interrogatories, filed on April 16, 1987, again before the statute of limitations had run, the defendant's answer to the first interrogatory stated in pertinent part as follows:

"Plaintiff's complaint refers to an incident which occurred 'on or about May 15, 1984.' That incident actually occurred on May 24, 1984."

From these documents, it is clear the defendant knew the correct date of the plaintiff's injuries from which his cause of action arose; therefore, the plaintiff's amended complaint related back to the original pleading and was not barred by FELA's three-year statute of limitations.

■■ We also note that the defendant argues that the plaintiff's complaint was also barred by the statute of limitations as the incident which formed the basis of the plaintiff's complaint was his accident of October 1, 1985, when he fell down the steps of the defendant's office building. The defendant contends that the plaintiff has never asserted this cause of action; therefore, the plaintiff's complaint regarding his injuries and resultant loss of work which were related to this incident is barred by the statute of limitations. This argument is without merit.

The plaintiff did not allege that an injury occurred on or about October 1, 1985, and the plaintiff testified that, although he fell on that date, he was not injured. The plaintiff explained that his fall was a result of the recent instability of his left knee which had been occurring during the two months prior to the incident. The plaintiff's doctor testified that the plaintiff's left-knee instability was a result of the plaintiff's injury of May 24, 1984. The October incident was a result of the plaintiff's ongoing problems with his knee and not a basis for a new cause of action. Therefore, there was no statute of limitations problem.

The defendant's fourth contention concerns the Safety Appliance Act, and the defendant's argument of this issue is twofold: first, the court erred in permitting the plaintiff to amend his pleadings during trial to add a claim under the Safety Appliance Act, and second, the court also erred in submitting jury instructions on the Safety Appliance Act. The defendant argues that since the Safety Appliance Act imposes strict liability upon the defendant if a violation of the Act is found, the instructions on strict liability confused the jury where negligence was also alleged under FELA. The defendant's argument under this issue is confusing, and it is not readily apparent what the defendant finds erroneous.

The defendant's first argument, that the court erred when it allowed the plaintiff to amend his pleadings during trial, appears to be premised upon the plaintiff's alleged improper questioning of a witness about strict liability under the Safety Appliance Act. This argument implies that the questioning is improper and does not reveal what the difficulty with the amendment of the plaintiff's complaint is, other than the defendant implies that improper questioning supplies

the proof to which the plaintiff's amended pleading conformed. The defendant also states that the amended complaint was filed on May 21, 1991, after the jury returned its verdict, from which we infer that the defendant questions the timeliness of the amended complaint.

Section 2—616(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—616(c)) provides that a party may amend his complaint at any time, before or after judgment, if the amendment is made to conform the plaintiff's pleadings to the proof at trial. (*Stringer Construction Co. v. Chicago Housing Authority* (1990), 206 Ill. App. 3d 250, 563 N.E.2d 819.) This section is to be liberally construed so that cases are decided on their merits and not on procedural technicalities. (*Deming v. Montgomery* (1989), 180 Ill. App. 3d 527, 536 N.E.2d 150.) Whether amendment of pleadings is to be allowed is a matter within the sound discretion of the court, and absent an abuse of this discretion, a court's determination will not be overturned on review. (*Stringer Construction Co.*, 206 Ill. App. 3d 250, 563 N.E.2d 819.) Doubts about allowing amendments should be resolved in favor of amendment; however, where the amendment is made to conform the pleadings to the proof, the amendment will not be allowed unless the evidence already produced supports the amendment. (*Stringer Construction Co.*, 206 Ill. App. 3d 250, 563 N.E.2d 819.) Here, the amended pleadings were supported by the proof presented at trial, and the court's allowance of the amended pleadings to conform to the proof was not an abuse of discretion.

■ At trial, Miller's testimony established that a drawbar has a head on it with a knuckle, and when two heads and knuckles close, railroad cars are coupled. When a drawbar becomes misaligned, an employee must go between two cars to straighten the drawbar before the cars will couple. Miller testified that on the date of the plaintiff's injury, the plaintiff went between two cars to move a misaligned drawbar to effect a coupling between them. He admitted that misaligned drawbars have occurred in other instances. As the claims investigator for the defendant, Miller determined that the defendant was liable to the plaintiff under FELA and the Safety Appliance Act. Plaintiff's counsel asked Miller about strict liability under the Safety Appliance Act, and the defendant objected. The court sustained the defendant's objection and instructed the jury to disregard Miller's testimony regarding strict liability.

The plaintiff's testimony also established that his duties as a switchman consisted of coupling and uncoupling cars. If a car does not couple, he must go between the cars to effect the coupling. When

the plaintiff went between two cars on May 24, 1984, it was to move a misaligned drawbar so that the cars would couple.

The purpose of the Safety Appliance Act is to protect parties who are injured while attempting to effect a coupling which did not occur automatically. (*Buskirk v. Burlington Northern, Inc.* (1982), 103 Ill. App. 3d 414, 431 N.E.2d 410.) Failure of cars to couple automatically due to a misaligned drawbar has been held to constitute a violation of the Safety Appliance Act. (*Buskirk*, 103 Ill. App. 3d 414, 431 N.E.2d 410.) Here, the evidence established that the plaintiff was injured when he went between cars to move a misaligned drawbar to effect a coupling. Thus, the proof supported a claim under the Safety Appliance Act, and the court properly allowed the plaintiff to amend his pleadings to conform to the proof presented at trial. As was noted previously, when the amendment is made to conform pleadings to proof, the amendment may be made either before or after judgment (Ill. Rev. Stat. 1991, ch. 110, par. 2—616(c)); therefore, although the plaintiff's amendment to the pleadings was not filed until the day the court entered judgment on the jury's verdict, the filing of the amended pleadings was timely.

■ Similarly, the court's instructing the jury on the Safety Appliance Act was not an abuse of its discretion. A jury instruction is proper where there is some evidence in the record to support the theory set out in the instruction. (*Deming*, 180 Ill. App. 3d 527, 536 N.E.2d 150.) The purpose of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence, and as a result, jury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party. (*Gaskin v. Goldwasser* (1988), 166 Ill. App. 3d 996, 520 N.E.2d 1085.) It is left to the court's discretion to determine which instructions will be given and in what form. (*Gaskin*, 166 Ill. App. 3d 996, 520 N.E.2d 1085.) We find the court did not abuse its discretion in instructing the jury on the law regarding the Safety Appliance Act.

As was determined previously, the evidence supported the plaintiff's amended pleadings in which a claim was brought under the Safety Appliance Act for his injuries incurred on May 24, 1984. Similarly, the court properly instructed the jury on this theory, since the plaintiff is entitled to have a jury instructed on all of his theories presented by his pleadings if supported by the evidence. (*Deming*, 180 Ill. App. 3d 527, 536 N.E.2d 150.) The fact that a FELA action provides for contributory negligence, but a Safety Appliance Act violation provides for strict liability of the defendant without concern for the plaintiff's contributory negligence, does not in and of itself create confu-

sion. Although contributory negligence is not applicable to a Safety Appliance Act violation, the plaintiff submitted the defendant's liability to the jury and undertook a more difficult task upon himself to prove the defendant's negligence and exposed himself to the risk of being found contributorily negligent.

In addition, the defendant takes issue with the fact that the plaintiff failed to submit a jury verdict form for the count under the Safety Appliance Act. The defendant did not object to the general verdict form submitted by the plaintiff. Under the verdict form provided, if any prejudice accrued, it was the plaintiff who was harmed, as the plaintiff gave the jury the opportunity to find contributory negligence. We do not find that the jury instructions were misleading or prejudicial to the defendant.

The defendant next argues that the circuit court erred in barring testimony regarding the plaintiff's preexisting condition of coronary artery disease. The defendant argues that this evidence was material to damages because it was the plaintiff's coronary artery disease and not his knee problem that disabled the plaintiff from work after October 1, 1985. The defendant further asserts that it was this preexisting condition that caused the plaintiff to refuse the position of yardmaster with the defendant, a fact which would have diminished the amount of damages awarded to the plaintiff.

■ As the defendant correctly states, the general rule is that evidence of a person's general health or physical condition both before and after an injury is admissible to show the extent, nature and probable effect of the injury and the cause of the subsequent physical condition. (*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 450 N.E.2d 402.) This rule is limited by the requirement that the evidence be sufficiently connected to the injury or be material to the issue of damages. (*Reynolds*, 115 Ill. App. 3d 88, 450 N.E.2d 402.) Here, the evidence the defendant desired admitted met neither of these criteria.

The defendant made an offer of proof regarding the plaintiff's coronary artery disease. In its offer of proof, the defendant proffered three depositions of plaintiff's treating physicians for this condition. None of the physicians testified that the plaintiff's coronary artery disease prevented the plaintiff from performing his duties as a switchman. In fact, the physicians' testimony established the contrary. Their testimony revealed that the plaintiff's coronary artery disease had been diagnosed in 1977, and after being diagnosed and treated for this condition, the plaintiff's activities were unrestricted, and he performed his regular duties as a switchman until his knee injury of May

24, 1984. Thus, the evidence of the plaintiff's coronary artery disease was immaterial and unrelated to his knee injury and his disability resulting from the injury.

In addition, evidence of the plaintiff's coronary artery disease would not have been relevant to the issue of damages. The only evidence presented at trial regarding the plaintiff's loss of employment was Dr. Shaw's testimony that the plaintiff could not return to work because of the knee brace requirement, a result of his knee injury, and Dr. Simmons' testimony that the plaintiff could not work as a switchman because the plaintiff's knee condition had deteriorated due to the onset of his osteoarthritis. This evidence established that the plaintiff was unable to work because of his knee injury, and no evidence was presented by the defendant, even in its offer of proof, that the plaintiff was unable to work due to his coronary artery disease. The court properly excluded this evidence, since the evidence of the plaintiff's coronary artery disease was irrelevant to his disability from his injury.

The defendant's sixth contention is that the court erred in permitting Dr. Simmons, plaintiff's treating physician for his knee condition, to testify about the possibility of future knee-replacement surgery. The defendant argues this was error because the doctor's testimony was speculative or conjectural and was therefore erroneous.

In Dr. Simmons' evidence deposition, plaintiff's counsel posed the following questions which form the basis of the defendant's objections:

"Q. Doctor, what progress or what type of prognosis do you have for this gentleman?

A. My feeling, as of his last visit, was that he was stable. My prognosis is that this gentleman may have to have some surgery at a future date.

Q. Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, based upon your treatment of this gentleman's disease, and based upon your knowledge of his condition, do you have an opinion as to whether or not he might or could need additional surgery in the future?

A. Yes.

Q. And what type of surgery do you foresee?

A. If we were going to do further surgery on him and if his condition worsened, it would be a total knee joint replacement."

Because the doctor in the foregoing colloquy framed his answer with "if," the defendant contends that the doctor's opinion was speculative, making his testimony inadmissible. The defendant asserts that it

was prejudiced because this testimony of possible future knee surgery influenced the jury in its award of damages.

In considering this issue, we note that the defendant questioned the plaintiff regarding possible future knee surgery. The defendant's questioning of the plaintiff sought to show that the plaintiff was unaware of the need for future surgery and that he had not discussed this possibility with Dr. Simmons. It is also noteworthy that the plaintiff did not present evidence regarding the cost of such future surgery.

■■■ Generally, the law is that a plaintiff must prove with reasonable certainty the need for future medical services to be awarded compensation for this expense. (*Biehler v. White Metal Rolling & Stamping Corp.* (1975), 30 Ill. App. 3d 435, 333 N.E.2d 716.) Here, although the doctor couched his answer in "if," we conclude that this answer was not speculative or conjectural but was his prognosis of the plaintiff's condition. The doctor had testified that at the time the plaintiff returned to work in April 1985, he had thought the plaintiff had reached maximum recovery, but that subsequent events revealed that the plaintiff's condition worsened when he developed degenerative osteoarthritis. The doctor explained that the plaintiff's osteoarthritis was a progressive condition which was related to the plaintiff's trauma and removal of the medial meniscus. Dr. Simmons also testified that he did not believe that the plaintiff was going to require further surgery if he continued his sedentary lifestyle. Because of the progressive nature of the plaintiff's condition, the doctor's testimony was not speculative but was based upon a reasonable degree of medical certainty and his experience. Moreover, the jury instructions on the elements of damages did not include damages for future medical services. We cannot conclude that the jury based any of its award upon future medical services when it was not so instructed.

The seventh argument raised by the defendant is that the evidence was insufficient to support the jury's verdict. The defendant asserts that: (1) the evidence failed to show the release signed by the plaintiff was invalid; (2) the evidence was insufficient to show the defendant was negligent as required under FELA; and (3) the evidence was insufficient to show that the defendant violated the Safety Appliance Act. We disagree.

■■■ We first consider the defendant's contention that the evidence was insufficient to show the release signed by the plaintiff was invalid. A valid release would defeat the plaintiff's claims against the defendant, and the validity of the release is governed by Federal rather than by State law. (*Maynard v. Durham & Southern Ry. Co.*

(1961), 365 U.S. 160, 5 L. Ed. 2d 486, 81 S. Ct. 561.) Mutual mistake of fact will invalidate a release and presents a jury question under the FELA. *Castro v. Chicago, Rock Island & Pacific R.R. Co.*, 81 Ill. App. 3d 233, 401 N.E.2d 5.

In the instant case, most of the evidence presented concerned the facts and circumstances at the time of the execution of the release signed by the plaintiff. Both the plaintiff and Miller, who signed the release on defendant's behalf, testified that they contemplated that the plaintiff would be working after the settlement of the plaintiff's claim, and that the plaintiff's employment was a consideration in reaching the settlement. Both thought the settlement a good one if the plaintiff were to continue to work. This evidence was sufficient to support the jury's determination that the release was invalid because of the parties' mutual mistake.

■■■ The next consideration is whether the evidence was sufficient to show the defendant liable under FELA or the Safety Appliance Act. In a claim under the FELA, a plaintiff must show that his injury resulted in whole or in part from the negligence of the defendant by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, or other equipment. (45 U.S.C. §51 (1982); *Gonet v. Chicago & North Western Transportation Co.* (1990), 195 Ill. App. 3d 766, 552 N.E.2d 1224.) Only slight negligence of the defendant needs to be proved to support the plaintiff's claim. (*Gonet*, 195 Ill. App. 3d 766, 552 N.E.2d 1224.) On review of a jury trial under the FELA, the reviewing court is limited to the single inquiry of whether the conclusion may be drawn that the negligence of the employer played any part whatsoever in the plaintiff's injury. (*Laird v. Illinois Central Gulf R.R. Co.* (1991), 208 Ill. App. 3d 51, 566 N.E.2d 944.) If that test is met, a reviewing court cannot overturn the jury's verdict. (*Laird*, 208 Ill. App. 3d 51, 566 N.E.2d 944.) Applying this standard, we find the evidence was sufficient to show that the defendant was negligent. The plaintiff testified that he had told the yardmaster about the misaligned drawbar on the morning of his injury, and that the yardmaster had advised him to move the drawbar with whatever means he had available. The plaintiff also testified that the method he employed to move the misaligned drawbar was a technique he was taught by the defendant when he was training for the switchman's job. These facts were sufficient to convince the jury that the defendant was negligent, as it failed to provide the plaintiff with a safe place to work, it allowed unsafe practices to become a common practice, and it failed to maintain its drawbars.

■■■ The defendant's assertion that the evidence was insufficient to show that it did not violate the Safety Appliance Act is also without merit. This court in *Buskirk v. Burlington Northern, Inc.* (1982), 103 Ill. App. 3d 414, 431 N.E.2d 410, held that the purpose of the Safety Appliance Act is to protect persons while attempting to effect a coupling which did not take place automatically, and that the failure of cars to couple automatically because of a misaligned drawbar constitutes a violation of section 2 of the Safety Appliance Act. (45 U.S.C. §2 (1982).) Here, the evidence established that the defendant did violate the Act. The plaintiff testified that his basic duties were to couple and uncouple cars, and that on the date of his accident, he had to go between two cars to effect a coupling because the drawbar was misaligned. Similarly, Miller testified that the plaintiff had injured himself when he went between two cars to realign a drawbar so that the cars would couple. The plaintiff's evidence was uncontradicted by the defendant and was sufficient to support the plaintiff's claim.

Lastly, the defendant contends that the jury's verdict was grossly excessive and indicated that the jury was motivated by passion and prejudice. In its argument, the only elements of damages which the defendant challenges are those awarded for the plaintiff's past and future lost wages. The defendant argues that the plaintiff's expert's testimony of actual lost wages and future lost wages was erroneous since the expert assumed that the plaintiff earned approximately $30,000 per year, while the plaintiff actually earned approximately $20,000 to $21,000 per year in the years before his accident. The defendant also asserts that the plaintiff's economic expert assumed that the plaintiff was unemployable, another erroneous assumption since the evidence revealed that the plaintiff was offered the yardmaster position. The final thrust of the defendant's argument is that the plaintiff's lost wages resulted from his loss of employment, a "minor dispute" under the RLA, and that the court lacked jurisdiction to consider this aspect of the plaintiff's damages.

It is well established that there is no mathematical formula for computing damages in the cases of personal injuries, and it is the aim of the law to attain a reasonable balance between the amount of the damages and the extent of the injuries. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) The award of damages is peculiarly a question of fact for a jury, and a reviewing court will not substitute its judgment for that of a jury unless the total amount of the verdict falls outside the limits of fair and reasonable compensation, or results from passion or prejudice, or is so large as to shock the judicial conscience. (*Carter v. Indiana Harbor*

*Belt R.R. Co.* (1989), 190 Ill. App. 3d 1052, 547 N.E.2d 488.) Wage losses comprise only one element of damages. (*York v. Grand Trunk Western R.R. Co.* (1979), 71 Ill. App. 3d 800, 390 N.E.2d 116.) Additionally, a jury can also consider pain and suffering when determining its verdict. (*York,* 71 Ill. App. 3d 800, 390 N.E.2d 116.) The damages awarded in the case *sub judice* are not so large as to shock the judicial conscience, do not appear to result from passion or prejudice and fall within the limits of fair and reasonable compensation.

▉▉▉ At trial, the jury was instructed on the elements of damages to be considered. This instruction stated that the jury should consider the nature, extent and duration of the injury, the disability and disfiguration resulting from the injury, the plaintiff's past and future pain and suffering, and the plaintiff's actual and future lost wages. The evidence in the record supporting the jury's verdict was as follows: At the time of the plaintiff's accident, he was 52 years of age, he had a GED, and he had performed manual labor only during his working career. As a result of his injury on May 24, 1984, the plaintiff underwent two surgeries on his knee, and after the first surgery, the plaintiff developed an infection. In the second surgery, the medial meniscus was removed from his left knee. The medical evidence established that the meniscus provided stability to the knee to prevent it from rocking back and forth, cushioned the knee when pressure was placed upon it, and dissipated heat to the outside of the joint when there was rapid movement. While the plaintiff initially returned to work after the two surgeries, his knee became unstable and began to "give out" on him, causing him to lose his balance and fall. Eventually, the injury to his knee caused him to develop degenerative osteoarthritis, a permanent, progressive condition leading to pain, effusion and instability in the knee. Further, the plaintiff has to wear a knee brace for stability and to prevent him from falling when his knee buckles. The plaintiff's treating physician, Dr. Simmons, testified that due to the changes in the plaintiff's knee, he cannot return to his former employment as a switchman. This evidence provided adequate support for awarding the plaintiff damages for past and future pain and suffering and for his permanent disability.

With regard to the evidence presented on actual and future wage losses, the plaintiff's economic expert testified that the plaintiff's actual wage loss from October 1985 until the date of trial was $168,859. The economic expert stated that his calculations of future wage loss were based upon annual earnings of $31,054. The expert determined that if the plaintiff worked until 62 years of age, his actual and future lost wages totalled $244,501, but if the plaintiff worked until 65 years

of age, his total lost wages would be $331,632. The expert's use of the $31,054 figure in his calculations was not patently unreasonable, as Miller testified that the plaintiff's actual wage loss for the 10 months he was initially off work and before entering into the settlement agreement was approximately $30,000, if you considered fringe benefits in the calculation. Thus, if the jury considered that the plaintiff lost a maximum of $331,632 in lost wages, the remainder of the $650,000 verdict (minus the setoff for the $90,540 previously awarded to the plaintiff under the settlement agreement) was awarded for the plaintiff's pain and suffering and disability. We find the evidence adequate to support the jury's verdict.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

RARICK and HARRISON, JJ., concur.