STRINGER CONSTRUCTION COMPANY, INC., Plaintiff-Appellee, v. CHICAGO HOUSING AUTHORITY, Defendant-Appellant.

First District (3rd Division)   No. 1—89—0332

Opinion filed September 26, 1990.

Schiff, Hardin & Waite, of Chicago (Paul M. Lurie, Mark C. Friedlander, and Kenneth M. Roberts, of counsel), for appellant.

Rotman, Medansky & Elovitz, Ltd., of Chicago (Louis S. Elovitz and Melvin B. Lewis, of counsel), for appellee.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

The plaintiff, Stringer Construction Company, Inc. (Stringer),[1] brought an action against the Chicago Housing Authority (CHA) seek-

---

[1] We will use "Stringer" interchangeably to refer to both Stringer Construction Company and its owner, Philip Stringer.

ing reimbursement for the costs of extra materials and labor expended in the construction of a housing project for senior citizens. Following a jury trial, the jury returned a verdict in favor of the plaintiff and awarded $334,813.25 in damages. The CHA appeals, contending that: (1) the trial court abused its discretion in granting plaintiff leave to amend its fourth amended complaint at the close of the evidence to plead a new cause of action; (2) the trial court abused its discretion for refusing to grant the CHA sufficient time to respond; (3) the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict; (4) the trial court erred in refusing to give certain jury instructions; and (5) the plaintiff's exclusive remedy lies with the Mechanics' Liens Act (Ill. Rev. Stat. 1989, ch. 82, par. 1 *et seq.*) (the Act).

The evidence produced at trial reveals the following. In 1970, the CHA began a project to erect an 86-unit senior citizens home at the intersection of Larrabee and Wisconsin in Chicago. The CHA obtained Federal funding for the project from the Department of Housing and Urban Development (HUD) and entered into a consolidated annual contributions contract with HUD on June 13, 1972. On November 27, 1972, the CHA contracted with a developer to construct the building known as Project Ill. 2-71. The developer could not fulfill its obligations and assigned its rights and obligations to a second developer, Industrial Mechanical, Inc. (Industrial). The CHA and HUD approved the assignment. American Insurance Company (American), a New Jersey corporation, issued a performance bond for the services to be rendered by Industrial. The contract required Industrial to complete the project by March 1, 1976. On September 1, 1976, the CHA declared Industrial in default of its contract.

In September of 1976, while the project was idle after Industrial was terminated, Philip Stringer was invited to meet with CHA officials to discuss taking over the project. Before the CHA declared Industrial in default, Stringer had been engaged as a subcontractor on the project and was therefore familiar with the project. At the CHA office, Stringer met with William Lebsock, the CHA's director of engineering, and his assistant. Stringer was provided with the plans and specifications for the project and was asked to submit a preliminary estimate for completion of the work. After computing prices for completing the project and obtaining estimates from subcontractors, Stringer submitted a proposal to Lebsock. Lebsock then instructed Stringer to meet with American. After negotiations, American approved Stringer's proposal. On April 21, 1977, the CHA sent a triparty contract proposal to Stringer, subject to Stringer's obtaining an

acceptable performance bond. On April 28, the CHA's board of commissioners approved signing of the tri-party contract with American and Stringer, and Stringer immediately took over the project with the understanding that the contract would become effective once it obtained a performance bond.

Stringer commenced operations a week later, but had not yet received a response from its application for a performance bond. Construction progressed smoothly through the month of May and the first half of June. On June 15, Stringer was told to stop work because the CHA was contemplating a design change. As originally designed, each unit was to be equipped with its own kitchen. The CHA decided, however, to seek approval from HUD to eliminate the kitchens and install a central kitchen and dining facility on the first floor, a design the CHA refers to as the "congregate kitchen" format. At the time, Stringer had already installed the plumbing, heating, telephone risers and electrical lines in the walls and floors in 20 of the 86 units. A letter dated July 21, 1977, was sent to HUD from the CHA's executive director submitting a preliminary cost estimate for the conversion and requesting HUD's approval and additional funding. The letter noted that additional HUD funding was required because "surplus funds [were] not available from other development programs." Stringer protested to the CHA's project inspector, A.B. Lundquist, complaining of the inevitable cost increases that would result from any delay.

The project lay dormant until mid-August of 1977 when Stringer was advised by American that HUD had disapproved of the congregate kitchen proposal. During the work stoppage, Stringer had learned that it could not obtain a performance bond because the bonding companies would not write a bond for a project where another contractor had previously defaulted. The parties subsequently entered into a new arrangement under which American contracted with the CHA for completion of the project and with American entering into a separate contract to retain Stringer as the general contractor. The two contracts were signed on August 15, 1977. Stringer was paid the following day for work done prior to the June 15 stop order. Under its contract with American, Stringer agreed to

> "complete all of the obligations of INDUSTRIAL MECHANI-CAL INC., in full accord with the specifications, not inconsistent herewith, for Project Ill. 2-71 (contract EP-991), the term specifications meaning, without limiting the generalization thereof, the general conditions, special conditions, and technical specifications and blueprints and drawings including all addenda thereto and change orders thereto, outlining such obliga-

tions, including all corrective and warranty work, for the sum of $992,517.00 pursuant to contractor's proposal dated March 22, 1977 as amended April, 1977."

The contract stated further:

"In the event that CHA orders extra work to be performed subsequent to the date of this agreement Contractor shall be authorized to negotiate the price of such extra work directly with the CHA and shall accept in full payment for said extra work the amount paid by the CHA to American."

Pursuant to provision GC.09 of the general conditions, Stringer also agreed:

"A. The Chicago Housing Authority may make changes in the work of the Contractor by making alterations therein, or by making additions thereto *** without invalidating the Contract.

* * *

C. Except in an emergency endangering life or property, no change shall be made by the Contractor unless he has received a prior written order from the Chicago Housing Authority countersigned by the Architect and approved on its face by the HUD, authorizing the change, and no claim for an adjustment of the Contract Price or time shall be valid unless so ordered."

On the same day that the two contracts were signed, the CHA's executive director sent a letter to HUD requesting HUD's approval for the same design change that HUD had previously rejected. Stringer testified that had he known that the CHA was still contemplating the congregate kitchen format, he never would have entered into the second contract with American.

Construction resumed according to the original plans until Stringer was again ordered to stop work some three weeks later. The CHA informed Stringer that it was again seeking approval from HUD to convert the project into the congregate kitchen format. At the time, Stringer had "roughed in" 40 of the 86 apartments. Stringer refused to stop until a written stop order was issued. A written stop order was finally delivered a week later when Lundquist visited the site and discovered that work was continuing. The stop order directed Stringer to cease construction in the kitchen areas of the individual units and in the area tentatively reserved for the congregate kitchen. Stringer's attorney sent a letter protesting the delay. Because it was too costly to build the apartments in portions, Stringer was forced to work in only those areas unaffected by the contemplated design change. As a result of Stringer's protest letter, Lebsock and his assistant held a meeting with Stringer and his attorney. Lebsock in-

formed Stringer that everything was on hold pending HUD's approval. Lebsock also stated that Stringer would be paid for the extra work.

After a month had elapsed, the CHA requested Stringer to prepare an estimate for converting the project to the congregate kitchen format. In December of 1977, Stringer was directed to implement the conversion. Thereafter, Stringer roughed in 68 of the 86 units under the new format. This work was performed without a written order as required by the general conditions of the contract. Concern over who was going to pay for the additional costs prompted Stringer's attorney to request another meeting. According to Stringer, Lebsock stated: "Phil, I know we've delayed, but I assure you HUD will approve those extras." Lebsock presented Stringer with a copy of a letter sent to HUD requesting approval and additional funding. The letter, dated November 21, 1977, was sent on the executive director's stationery, but was signed by Lebsock as "Acting Executive Director." The letter disclosed HUD's refusal to approve the conversion because of the absence of a "firm commitment for an operator of the proposed facility." In the letter, Lebsock advised HUD of the CHA's intention to hire a health care administration consultant and an operator for the facility. Lebsock further requested that HUD approve the design change and provide additional funding.

Sometime in either January or February, the CHA reversed its decision and ordered Stringer to return to the individual kitchen format. Lebsock explained that HUD again rejected the congregate kitchen design. Stringer undertook reversing its previous work, modifying the walls, electrical wiring and the plumbing. This work was also performed without a written order. Stringer was not compensated for any of the extra work.

In the early spring of 1978, HUD finally gave partial approval of the CHA's request to convert the building to the congregate kitchen format, and the building was constructed with a central kitchen and dining facility on the first floor. However, each unit was also equipped with a kitchen because HUD disliked the idea of having "hot-plates" in the apartments. On April 21, 1978, the CHA board issued a written change order authorizing payment of $15,000 to revise the electrical wiring. In February and September of 1979, the board issued two more written change orders authorizing payments totaling $50,000. In February of 1980, the CHA declared that Stringer had defaulted by not providing enough manpower for the job and terminated the contract. The present litigation followed.

Count I of Stringer's fourth amended complaint was directed

against both the CHA and American and was based on negligent misrepresentation. Counts II and III were based on unjust enrichment. After Stringer completed its case in chief, Stringer and American agreed to an out-of-court settlement. Stringer also agreed to voluntarily dismiss the unjust enrichment count against the CHA after the CHA filed a motion to dismiss the count. Thereafter, the CHA presented a two-tiered defense seeking to establish that: (1) the alleged misrepresentation was a future promise upon which a negligent misrepresentation action cannot rest; and (2) Stringer failed to disengage itself after learning of the alleged misrepresentation.

At the close of all the evidence, the trial judge granted the CHA's motion for a directed verdict on the negligent misrepresentation count on the ground that Stringer had continued to work on the project after learning of the misrepresentation.[2] The trial judge, however, believed that Stringer may have mislabeled its cause of action. After reviewing the evidence, the trial judge was convinced that Stringer had presented enough evidence to satisfy the elements for a cause of action sounding in promissory estoppel. The trial judge subsequently granted Stringer leave to amend its fourth amended complaint with an additional count sounding in promissory estoppel. Stringer submitted its fifth amended complaint the following morning along with revised jury instructions.

In its fifth amended complaint, Stringer alleged, *inter alia*, that: following the first order to stop work, the CHA requested Stringer to resume construction as originally proposed; Stringer was unwilling to do so due to the CHA's indecision concerning the format of the construction; Stringer responded that it would not undertake completion of the project unless it was assured that construction would proceed in accordance with the original plans and specifications; "[i]n order to induce Plaintiff to undertake completion of the project, Defendant expressly promised and assured Plaintiff that a final decision had been made to complete the structure in the form originally proposed"; and in reliance upon that promise, Stringer entered into a contract with

---

[2]We are compelled to confess our bewilderment that the parties reached the trial stage on the negligent misrepresentation count. In Illinois, the tort of negligent misrepresentation applies to situations involving defendants who are in the business or profession of supplying information for the guidance of others and who make negligent representations in the course of their business or profession. (See, *e.g., Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.* (1982), 109 Ill. App. 3d 132, 134-35, 440 N.E.2d 282.) There was never any allegation that the CHA is in the business of supplying information and clearly no such allegation could be made.

American to complete construction of the project. Stringer further alleged, *inter alia*, that: it had learned in December of 1977 that the CHA would be unable to obtain approval for the conversion for an indefinite period of time in the future; Stringer would not be paid unless and until such approval was obtained; Stringer was reluctant to proceed further; and "[i]n order to induce Plaintiff to continue with the project, Defendant expressly promised Plaintiff that if Plaintiff would continue to provide work and material for said project, Defendant would pay for all such work and material."

The CHA moved for a directed verdict, arguing that promissory estoppel is not applicable against a public body. The motion was denied. After the jury rendered its verdict in favor of the plaintiff, the CHA filed a motion for judgment notwithstanding the verdict, claiming that: (1) promissory estoppel cannot be applied against a governmental agency; (2) leave to amend after trial was an abuse of discretion; and (3) Stringer did not rely and could not have reasonably relied upon the CHA's promises. That motion was also denied.

■ Before addressing the CHA's first contention that the trial judge abused his discretion in granting Stringer leave to amend its fourth amended complaint to conform to the proof, we shall consider the CHA's last contention that the Mechanics' Liens Act (Ill. Rev. Stat. 1989, ch. 82, par. 1 *et seq.*) was Stringer's exclusive remedy because Stringer was in reality a subcontractor. Because the identical argument has been previously rejected, we will assume for the sake of argument that Stringer was in fact a subcontractor (see 17 Am. Jur. 2d *Contractor's Bonds* §56, at 235 (1964), citing *McDonald v. Calumet Supply Co.* (1939), 215 Ind. 536, 19 N.E.2d 567) and hold that the Act did not preclude Stringer from invoking the doctrine of promissory estoppel. The CHA's argument was previously rejected in *Swansea Concrete Products, Inc. v. Distler* (1984), 126 Ill. App. 3d 927, 934, 467 N.E.2d 388, where the court held that a subcontractor who fails to perfect a mechanics' lien but has dealt directly with the property owner may recover under the doctrine of promissory estoppel. Having disposed of the CHA's assertion that Stringer was statutorily precluded from seeking other remedies, we now turn to the question of whether the trial judge abused his discretion in allowing Stringer to amend its fourth amended complaint at the close of the evidence.

The CHA asserts that the new cause of action materially altered the nature of the proof required to defend and was untimely as the case had been in litigation for eight years and the plaintiff had previous opportunities to amend. The CHA further contends that the trial court erroneously denied its motions for a directed verdict and

judgment notwithstanding the verdict on the ground that promissory estoppel is inapplicable to a municipal corporation unless the municipality was within its power to enter into the contract (*South Suburban Safeway Lines, Inc. v. Regional Transportation Authority* (1988), 166 Ill. App. 3d 361, 366, 518 N.E.2d 1005), and the promise was made by one acting within the scope of his authority (*Lake Shore Riding Academy, Inc. v. Daley* (1976), 38 Ill. App. 3d 1000, 1002, 350 N.E.2d 17).

We agree that the trial judge abused his discretion in granting Stringer leave to amend its complaint at the close of the evidence. Section 2—616 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—616) provides that amendments changing the cause of action or adding new causes of action may be allowed at any time before final judgment on just and reasonable terms, and that a pleading may be amended to conform the pleadings to the proof at any time, before or after judgment. The decision of whether to allow amendments following the presentation of the evidence rests within the sound discretion of the trial court, and that decision will not be disturbed absent a clear abuse of discretion. (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 84, 392 N.E.2d 628.) In order that litigants may fully present their causes of action and settle their controversies on the merits, the greatest liberality should be provided in allowing amendments. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1074-75, 510 N.E.2d 1162.) Doubts should be resolved in favor of allowing amendments. (*Ryan*, 157 Ill. App. 3d at 1075.) However, amendment of the pleadings to conform to the proof cannot be allowed unless the evidence already produced supports the amendment. *Wells v. Great Atlantic & Pacific Tea Co.* (1988), 171 Ill. App. 3d 1012, 1020, 525 N.E.2d 1127; *Lawing v. Chicago Transit Authority* (1986), 142 Ill. App. 3d 119, 125, 491 N.E.2d 145; *Mundt v. Ragnar Benson, Inc.* (1974), 18 Ill. App. 3d 758, 772-73, 310 N.E.2d 633; *Friestedt v. Chicago Transit Authority* (1970), 129 Ill. App. 2d 153, 156, 262 N.E.2d 771.

To sustain a cause of action for promissory estoppel, the claimant must prove: (1) a promise unambiguous in terms; (2) reliance upon the promise; (3) that such reliance was expected and foreseeable by the promisor; and (4) that such reliance resulted in injury. (*Vincent DiVito, Inc. v. Vollmar Clay Products Co.* (1989), 179 Ill. App. 3d 325, 327-28, 534 N.E.2d 575; *Yardley v. Yardley* (1985), 137 Ill. App. 3d 747, 754, 484 N.E.2d 873.) In its fifth amended complaint, Stringer alleges two instances where a promise induced reliance: (1) a promise made in August of 1977 that a final decision had been made to build

the project according to the original plans which induced Stringer to enter into the second contract with American; and (2) a promise made in December of 1977 that the CHA would pay for the extra labor and materials in order to induce Stringer to proceed with construction after the CHA failed for the second time to secure HUD's approval.

■■ Assuming for the sake of argument that the evidence supported the existence of the first promise, the evidence adduced at trial clearly shows that Stringer did not rely upon that promise to its injury. When Stringer received the second stop order in September after signing the second contract with American and learned that the CHA was still contemplating the congregate kitchen format, Stringer had not yet performed any extra work and was within its rights to refuse any directions to effect changes absent a written proceed order or change order. There was no causal connection between Stringer's signing of the second contract with American and its decision in December, some four months later, to perform extra work without a written order. Stringer's brief refers to the increase in costs caused by the interruption which Stringer would never have incurred had it not been induced to enter into the second contract. Those costs, however, are delay damages and not costs incurred by reason of performing extra work. The essence of the dispute involves costs associated with extra work, not damages caused by delays. Nor could Stringer recover delay damages as the contract specifically provides in provision G.C.12(B) that: "No payment or compensation of any kind shall be made to the Contractor for damage because of hindrance or delay from any cause in the progress of the work whether such hindrances or delays be avoidable or unavoidable." Therefore, the evidence does not establish a *prima facie* case for an action in promissory estoppel based on the alleged first promise as the proof did not establish the fourth element.

■■ The only evidence relied upon by Stringer in support of the existence of the second promise was Stringer's own testimony: "Mr. Lebsock said that—everything was on hold pending HUD's approval—However, we would be paid for any changes that occur." This testimony was elicited when Stringer was asked to describe the conversation at the first meeting. Because Stringer described Lebsock's statement in the passive voice, which may or may not have been an accurate portrayal of the conversation, his testimony fails to establish "a promise unambiguous in terms" that the CHA was going to pay if HUD's approval were not obtained. Further, when Lebsock told Stringer that he would be paid for the extra work, Lebsock also showed Stringer a copy of the letter he sent to HUD requesting addi-

tional funding for the conversion. If Lebsock was making a promise that the CHA would pay if HUD rejected the design change, why did he show Stringer a letter sent to HUD requesting additional funding? The only natural conclusion that could be drawn from the testimony is that Lebsock was assuring Stringer that HUD would approve the changes and provide the additional funding as requested in the CHA's letters of correspondence with HUD. This conclusion is buttressed by Stringer's other testimony describing the conversation at the second meeting. According to Stringer's own testimony, Lebsock stated at the second meeting: "Phil, I know we've delayed, but I assure you HUD will approve those extras." The totality of the evidence establishes at most a prediction that HUD would approve the changes and provide the additional funding. A prediction, opinion or prophecy is not a promise. (See *Security Bank & Trust Co. v. Bogard* (App. Ct. Ind. 1986), 494 N.E.2d 965, 969 (holding that statement by bank employee that he would take farmer's loan application to loan committee and that bank would soon extend credit to farmer was only a prediction and not a promise for purposes of promissory estoppel).) Therefore, the evidence fails to establish a *prima facie* case for promissory estoppel based on the alleged second promise as the proof fails to establish the first element.

■ It is also clear that amendments to the pleadings should not be allowed if the other party would be prejudiced or surprised. (*Trident Industrial Products Corp. v. American National Bank & Trust Co.* (1986), 149 Ill. App. 3d 857, 866, 501 N.E.2d 273; *Able v. Pure Oil Co.* (1972), 8 Ill. App. 3d 558, 563, 290 N.E.2d 331.) The test for determining whether the trial court properly exercised its discretion is whether the amendment furthers the ends of justice. (*Trident*, 149 Ill. App. 3d at 866.) After considering the factors outlined in the cases, we have concluded that allowing Stringer to amend its complaint was an abuse of discretion even if that amendment had been supported by the evidence. ·

■ It has been generally recognized that amendments should not ordinarily be permitted after trial has begun if the proposed amendment raises matters of which the pleader had full knowledge at the time of interposing the original pleading and there is no excuse for failing to raise those matters in the original pleading. (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 165, 356 N.E.2d 164.) Stringer's new theory of recovery under the doctrine of promissory estoppel is not based on any evidence that was not known when the litigation commenced in 1980. We also consider that Stringer has had previous opportunities to amend as this case has been in litigation for eight years

and that Stringer went to trial with its fourth amended complaint. (See *Friestedt v. Chicago Transit Authority* (1970), 129 Ill. App. 2d 153, 156, 262 N.E.2d 771 (upon a motion to amend the pleadings, the court may consider whether there were previous opportunities to amend).) Most important, however, is the rule that amendments should not be permitted where the amendment alters the nature of the proof required to defend. (*Blazina*, 42 Ill. App. 3d at 165.) Had the CHA known it was going to defend a promissory estoppel action, it could have engaged in additional discovery and made an attempt to present evidence challenging the reasonableness of Stringer's reliance. The CHA could also have interposed the affirmative defense that the alleged promises were *ultra vires*, and in support thereof, present evidence demonstrating Lebsock's lack of authority to make the alleged promises and evidence detailing the appropriation process for CHA projects. On the current status of the record, this court is unable to determine whether the CHA could have been rendered liable under the doctrine of promissory estoppel had a *prima facie* case been established.

◼◼ Stringer's argument that the CHA's promise could not be *ultra vires* because the CHA's actions fall within that category of cases where the municipality had the power to enter into the contract, but exercised its power in an irregular manner (*Stahelin v. Board of Education School District No. 4* (1967), 87 Ill. App. 2d 28, 40, 230 N.E.2d 465), is without merit because the only money that was spent irregularly, if any, was HUD's money. Stringer's new theory of recovery, however, is based upon a promise that the CHA would pay if HUD withheld approval. There is no evidence that the CHA ever spent any of its own money on the project.

For the foregoing reasons, the judgment must be reversed. In order to do justice, however, we believe a new trial is warranted. Accordingly, we reverse the judgment of the circuit court and remand for a new trial.

Judgment reversed and remanded.

RIZZI and FREEMAN, JJ., concur.