CONTINENTAL LEAVITT COMMU-
NICATIONS, LTD., an Illinois
corporation, Plaintiff,

v.

PAINEWEBBER, INCORPORATED, a
Delaware corporation, Defendant.

No. 92 C 5939.

United States District Court,
N.D. Illinois,
Eastern Division.

July 19, 1994.

Michael Gary Erens, Stuart Michael Gimbel, Marci Ann Firfer, Lee J. Levin, Kamensky & Rubinstein, Lincolnwood, IL, for plaintiff.

Thomas M. Knepper, David A. Eide, Neal, Gerber & Eisenberg, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiff Continental Leavitt Communications, Ltd. ("CLC") has sued Defendant PaineWebber Incorporated ("PWI") in a three count First Amended Complaint. Now before the Court is PWI's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff sells and distributes electronic products wholesale. In January of 1991, Cellular Depot, Inc. d/b/a Cellular Wholesale ("Cellular"), a customer having past dealings with CLC, approached CLC about purchasing a large volume of electronic products. Both parties wanted to go through with the deal, but CLC would not extend Cellular unsecured credit and Cellular would not pay COD. By way of compromise, Cellular proposed a credit purchase whereby Cellular would post bearer bonds as collateral.

On January 14, 1991, for CLC's consideration prior to closing the proposed deal, Cellular sent four bearer bonds issued by the General Motors Acceptance Corporation of Canada, Limited ("GMAC"). Each bond had a face amount of ten thousand Canadian dollars. Over the period of January 14 to February 10, 1991, CLC received a total of eighteen such bonds.

On either January 16 or 17, 1991, Melvyn F. Cohen, CLC's chief financial officer, and Ina Nudleman (now Jones), a CLC employee, went to PWI's offices in Northbrook, Illinois, taking several of the GMAC bonds with them. Cohen and Nudleman met with David Munwes, a PWI employee and stock broker. Although CLC did not have an account with any brokerage firm, including PWI, it had previously, in July of 1985, established a retirement plan for its employees. The plan, now known as the Continental Leavitt Communications, Ltd. Profit Sharing Plan and Trust (the "Plan"), had maintained an account at PWI since June 5, 1989. Munwes was responsible for the Plan's account and was Cohen's contact at PWI for dealings with respect to the Plan. The two enjoyed a "very cordial" relationship and spoke once or twice a month regarding the Plan's account at PWI. Based on that relationship, Cohen had contacted Munwes and asked him to evaluate Cellular's GMAC bonds. Munwes told him to bring them to his office at PWI. (Cohen Aff. ¶ 14.) According to Cohen, he took the bonds to Munwes to:

obtain his and PaineWebber's expert opinion regarding whether the Bonds were good, genuine and authentic, whether they could be used as collateral for a potential

business transaction with one of Continental's customers, and whether, if that customer failed to pay Continental, Continental could redeem the bonds for cash through PaineWebber. (Cohen Aff. ¶ 16.)

Cohen, Nudleman and Munwes met for between ten and thirty minutes. Cohen told Munwes about the potential sale to Cellular, showed him the bonds, asked if the bonds would be good collateral and also asked whether, if necessary, PWI would cash in the bonds for CLC. Munwes looked at the bonds and then left his office with them, stating that he wanted someone else to look at them. Munwes was gone for five to ten minutes. When he returned, he stated that the bonds were "good, genuine and authentic." (Cohen Aff. ¶ 19.) Munwes also stated that PWI would dispose of the bonds if CLC obtained from Cellular a letter authorizing CLC to dispose of the bonds in the event of default. (Cohen Aff. ¶ 19.) Munwes hoped that CLC would use PWI to dispose of the bonds, if necessary, and would have charged CLC a fee to do so. Cohen left the meeting feeling "comfortable" that the bonds were sufficient collateral. (Munwes Dep. at 107–09.)

CLC accepted the eighteen GMAC bonds as collateral, extended Cellular credit, and obtained the necessary paper work from Cellular to liquidate the bonds. Cellular eventually defaulted on its credit payments and CLC instructed PWI to redeem the bonds for cash. Before the bonds were redeemed, however, they were seized by the Federal Bureau of Investigation. Apparently, the bonds had been stolen prior to their having been authenticated; they were missing their "certificate of authentication" signatures, making them nonnegotiable.

CLC claims to have lost $119,883.65 as a result of its inability to liquidate the bonds and collect on Cellular's debt. Having attempted, without success, to obtain recompense from PWI, CLC has filed this lawsuit claiming that Munwes's erroneous advice resulted in the loss. In its Amended Complaint, CLC seeks to recover on theories of negligent representation, promissory estoppel, and breach of fiduciary duty. In the instant motion, PWI contends that each of these theories must fail.

## II. ANALYSIS

### 1. Standard on Summary Judgment

Summary judgment is appropriate when:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(a). A party moving for summary judgment bears the initial burden of informing the district court, and the nonmoving party, of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This requirement necessitates that the moving party point to those portions of the record or of the nonmovant's case which it believes demonstrate the absence of a genuine issue of material fact. *See id.* Once the moving party has carried its initial burden of pointing to defects in the nonmoving party's case, the nonmoving party must come forward with evidence sufficient to create a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

■ The standard for granting summary judgment "mirrors" the standard for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). That is, summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict. *Id.* Where, however, reasonable minds could differ as to what conclusion is dictated by the evidence, summary judgment should be denied. *Id.* at 250–51, 106 S.Ct. at 2511. In making the determination whether reasonable persons could differ as to the evidence, the Court must consider whether the nonmovant has put forth sufficient evidence to satisfy the substantive evidentiary standard for its case. *Id.* at 255, 106 S.Ct. at 2513. Here, CLC must prove its case by a preponderance of the evidence.

### 2. Count One: Negligent Misrepresentation

The state of Illinois recognizes the tort of negligent misrepresentation. *Zahorik v. Smith Barney, Harris Upham & Co.*, 664 F.Supp. 309, 313 (N.D.Ill.1987). Negligent misrepresentation is an exception to the rule, known as the *Moorman* doctrine in Illinois, that one cannot recover economic damages based on a negligence theory. *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). However, economic losses may be recovered for torts such as intentionally false representations, i.e. fraud, and for negligently false representations when made by one in the business of supplying information for the guidance of others in their business transactions, i.e. negligent misrepresentation. While there are varying standards for negligent misrepresentation, *see Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 843 P.2d 890, 895 (1992) (discussing history and standards of the tort), Illinois recognizes the tort as stated in the Restatement (Second) of Torts § 552 (1977). *See Greycas, Inc. v. Proud*, 826 F.2d 1560, 1565 (7th Cir.1987) (discussing standard for the tort), *cert. denied*, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988). Section 552 of the Restatement (Second), in relevant part, says:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.

PWI argues that it did not owe CLC a duty to exercise care because it is not in the course of supplying information and it did not have a pecuniary interest in CLC's transaction with Cellular. PWI also argues that, as a matter of law, CLC cannot show "justifiable reliance." The Court now turns to those arguments.

### 1. PWI's Duty to CLC

In order to show a duty owed, a negligent misrepresentation plaintiff must show that the defendant was either in the business of supplying information, or that the defendant had a pecuniary interest in the plaintiff's transaction with a third party. The duties imposed by the tort are intended to limit the liability for negligence of a supplier of information for commercial transactions to cases where the supplier "manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs." Restatement (Second) of Torts § 552 Comment a. (1977). These duties reflect the reasonable expectations of a user of information. Given the circumstances in which the information was supplied, the user either is entitled to reasonable expect the supplier to use due care in giving the information or not. *See id.* Generally, when the supplier gives information to the user in the course of the supplier's business, the user can expect the supplier to use due care. However, when the supplier gives a "curbstone opinion", or one that is purely gratuitous, such as in a social setting, the user of the information is not justified in expecting the supplier to have used due care in given the information. *See id.* Comment d.

Defendant contends that Plaintiff should not have expected PWI to use reasonable care in evaluating the bonds because PWI is not in the business of supplying information and did not have a pecuniary interest in CLC's transaction. The Court disagrees, on both Counts.

At minimum, Plaintiff has established a genuine issue of material fact regarding PWI's business. CLC has produced evidence showing that PWI maintains a research department which has the sole function of providing its brokers with information to pass on to its clients; and, unlike a discount brokerage house, PWI provides information and advice to its clients regarding investment opportunities. (Munwes Dep. at 42; N. Cohen Dep. at 32.) At his deposition, Munwes testified that PWI often supplied information and advice which did not generate commissions. (Munwes Dep. at 200.) This advice is given in hopes of building

relationships which later lead to commissions. (Munwes Dep. at 200.) This evidence supports Plaintiff's allegation, at paragraph 4 of its First Amended Complaint, that PWI is "in the business of supplying information and rendering advice" to its customers in their dealings with third parties. This allegation, and its supporting evidence, distinguishes this case from *Zahorik v. Smith Barney, Harris Upham & Co.*, 664 F.Supp. 309 (N.D.Ill.1987), upon which Defendants rely, but which actually supports Plaintiff's position.

In *Zahorik*, an investor sued a Smith Barney, a securities brokerage firm, for negligent misrepresentations allegedly made by the firm when it solicited and obtained the plaintiff's investment in an oil and gas limited partnership. Judge Aspen dismissed the plaintiff's claim for negligent misrepresentation because the plaintiff had failed to plead that Smith Barney provided information to potential customers as part of its business. Recognizing that the plaintiff had argued that "a significant portion of Smith Barney's business is to provide information to potential customers", Judge Aspen granted the plaintiff leave to amend its complaint to that effect. By granting leave to amend, Judge Aspen indicated that a complaint that included allegations regarding Smith Barney's business would state a claim for negligent misrepresentation.

■ It would be incorrect to conclude that brokerage houses may always be deemed to have a duty based on section 552. Brokerage houses may not always be sued as providers of information, particularly when the brokerage house serves as an agent in an arm's length transaction with its principal's investor, *see Rosengard v. McDonald*, 205 Ill.App.3d 208, 150 Ill.Dec. 53, 562 N.E.2d 583 (1990); *Black, Jackson & Simmons Ins. Brokerage, Inc. v. International Business Machines Corp.*, 109 Ill.App.3d 132, 64 Ill. Dec. 730, 440 N.E.2d 282 (1982). In such circumstances, the information user is entitled to expect not to be intentionally misled, but he cannot rely on the due care of his seller's agent. Here, in contrast, the information provided was supplied for the very purpose for which the loss occurred, with the supplier having complete knowledge of the intended use. In such circumstances, the Court cannot conclude, as a matter of law, that Plaintiff unreasonably expected PWI to use due care in giving advise.

PWI contends that the advice rendered was completely gratuitous, a "curbside opinion." While it is true that PWI was not paid for the advice rendered and did not expect to receive any consideration therefor, that fact does not mean that PWI had no "pecuniary interest" in the CLC bond transaction. Evidence submitted supports the following. After receiving the bonds from Cellular, Cohen contacted Munwes to ask him to evaluate the bonds; Munwes told Cohen to bring the bonds to Munwes's office at PWI. After stating that the bonds were genuine, Munwes solicited CLC's business in disposing of the bonds and would have charged a fee for doing so. (Munwes Dep. at 107–09.) In fact, Munwes admitted that, after meeting with CLC, he told his sales assistant: "we can expect that CLC will open up an account and that they have some bearer bonds to dispose of . . . ." (Munwes Dep. at 106.) He was correct. There is no dispute that after Cellular defaulted, CLC sought to dispose of the bonds through PWI. These facts support the inference that PWI supplied information to CLC to keep their business with respect to the Plan and to arrange to dispose of the bonds and reap a transaction fee. Those conclusions are sufficient to establish a "pecuniary interest." On this issue, whether an information supplier can have a pecuniary interest in a transaction without a direct payment of consideration, the Restatement (Second) of Torts says:

> The defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him for it or paid in a transaction in the course of and as a part of which it is supplied. It may, however, be of a more indirect character. Thus the officers of a corporation, although they receive no personal consideration for giving information concerning its affairs, may have a pecuniary interest in its transactions, since they stand to profit indirectly from them, and an agent who expects to receive a commission on a sale may have

such an interest in it although he sells nothing.

Restatement (Second) of Torts § 552 Comment d. (1977). In the opinion of the Court, CLC has sufficiently demonstrate PWI's indirect pecuniary interest in the bond transaction to withstand a motion for summary judgment on that issue. Moreover, the fact that PWI knew the very purpose for which CLC sought its advice weighs against judgment for PWI. See Mur–Ray Management Corp. v. Founders Title, 169 Ariz. 417, 422–23, 819 P.2d 1003, 1008–09 (Ct.App.1991) (reversing grant of summary judgment on negligent misrepresentation claim where escrow agent, receiving no compensation from plaintiff, supplied information to plaintiff knowing that plaintiff was relying on such advice to protect interest in escrow property); Mark Twain Plaza Bank v. Lowell H. Listrom & Co., 714 S.W.2d 859, 865–66 (Mo.Ct.App.1986) (affirming judgment against stock brokerage firm that negligently misrepresented the financial status of a stock account to a bank seeking to determine whether to accept the stock as collateral).

While other facts in the record support PWI's argument that Munwes acted gratuitously,[1] the Court cannot weigh evidence on a motion for summary judgment. In the opinion of the Court, Plaintiff has succeeded in demonstrating material issues for trial. Accordingly, with respect to Count One, Defendant's Motion for Summary Judgment is denied.

### 2. Reasonable Reliance

The GMAC bonds accepted by CLC were invalid because they lacked a certificate of authentication. Paragraph 10 of the bond's terms and conditions of notes states:

Neither this Note nor any coupon appertaining hereto shall become valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Fiscal Agent acting under the Fiscal and Paying Agency Agreement.

(Cohen Dep. Ex. 1, ¶ 10.) According to the Defendant, this language demonstrates that, as a matter of law, Plaintiff cannot show reasonable reliance on PWI's inaccurate information. CLC contends that the issue is a matter of fact to be left to trial.

This debate reflects the clash of two common law principles. Defendants rely upon the principle that: "A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." Central States Joint Bd. v. Continental Assurance Co., 117 Ill.App.3d 600, 73 Ill.Dec. 107, 453 N.E.2d 932, 936 (1983). Plaintiff counters with the proposition that: "one should not be allowed to hold oneself out as an expert whose statements or advice is to be relied upon and then after someone else has relied on that advice to his detriment, say, 'You should not have believed me.'" Duhl v. Nash Realty Inc., 102 Ill.App.3d 483, 57 Ill. Dec. 904, 911, 429 N.E.2d 1267, 1274 (1982). In the opinion of the Court, the latter of these propositions governs this case.

■ Defendant correctly states the general rule as to reliance: a plaintiff may not be deemed to have reasonably relied on a defendant's misrepresentation when the plaintiff has the opportunity and resources to inquire into the information. See Central States Joint Bd. v. Continental Assurance Co., 117 Ill.App.3d 600, 73 Ill.Dec. 107, 111–12, 453 N.E.2d 932, 936–37 (1983). This rule is excepted, however, where the plaintiff lacks the information necessary to evaluate the representation and the plaintiff has placed some form of trust in the defendant. Commercial Nat'l Bank of Peoria v. F.D.I.C., 131 Ill. App.3d 977, 87 Ill.Dec. 107, 112, 476 N.E.2d 809, 814 (1985). Here, there is sufficient evidence for the finder of fact to conclude that Cohen lacked the expertise to evaluate the bonds and that his trust in PWI was justified.

■ The GMAC bonds' Terms and Conditions are written in minuscule type and are crammed into a single back page.[2] When

---

1. For example, Munwes had been a social friend of one of CLC's principals for a long time.

2. According to Cohen, the print can only be read comfortably under a magnifying glass. (Cohen

Aff. ¶ 23.) While the Court has not had difficulty reading a copy of one of the bonds, (Cohen Dep. Ex. 1), the Court agrees that the Terms and Conditions present challenging reading material.

Cohen got the bonds, he started to read the back, but quickly gave up, deciding that he wanted an expert's opinion. Cohen has stated that he "didn't know what the hell [he] had in [his] hands." (Cohen Dep. at 23.) Given that Cohen had no experience with bearer bonds, such was not an unreasonable course of action. Although Cohen might have brought the bonds to CLC's corporate counsel, he called Munwes at PWI instead. According to Cohen, PWI had held itself out to him as having expertise with securities. (Cohen Aff. ¶ 13.) Munwes reinforced that representation by telling Cohen to bring the securities over to PWI for Munwes to review. Munwes, and PWI, never recommended that Cohen take the matter to an attorney.

In giving his opinion that the bonds were sufficient collateral, Munwes knew all of the transaction's relevant facts, particularly Cohen's uncertainty as to the validity of the collateral. Now that PWI's advice has proven faulty, it has taken the position that CLC should not have believed its recommendation. This argument would require Cohen to have (1) relied on his own reading of the bonds, or (2) sought advice from someone other than or in addition to PWI. Given PWI's representations regarding its expertise with securities, neither of these options is more reasonable than the approach selected by Cohen. While Cohen might have attempted to satisfy himself as to the bonds' authenticity and thus might have identified, amidst the variety of provisions scripted in fine print, the single sentence upon PWI relies, he chose to seek the opinion of a party which was more experienced and which could reassure him as to the bonds' authenticity. PWI represented that it had expertise and experience with securities; there is no evidence that these representations were qualified. Such representations undermine PWI's position that Cohen was just as likely as it to find the bonds' weakness. Cohen could reasonably have expected PWI to know what to look for. If PWI did not know, it should not have represented to the contrary.

Similarly, Cohen might have sought advice from another party instead of, or in addition to, seeking advice from PWI. Perhaps, with the benefit of 20/20 hindsight, it would have been *more reasonable* for Cohen to have sought the advice of an attorney that specializes in bearer bonds or some other specialist. This conclusion does not necessitate the further conclusion that seeking advice from PWI was unreasonable as a matter of law. Evidence in the record supports the position that PWI held itself out as capable of rendering a reliable opinion on the matter. There is no evidence that Cohen acted unreasonably in relying on those representations. While Cohen might also have sought additional advice, there is no evidence in the record that would impose such a duty on him. As stated by Judge Posner in *Greycas, Inc. v. Proud:* "The law normally does not require duplicative precautions unless one is likely to fail or the consequences of failure ... would be catastrophic." 826 F.2d 1560, 1566 (7th Cir. 1987). There is no evidence that PWI's opinion was "likely to fail", that the failure of the opinion would be "catastrophic", or that CLC "assumed the risk" of proceeding with the bond transaction by going forward with a known danger. Having first stated "you can rely on me", PWI cannot now say "you should not have listened to me."

The authority cited by PWI is not to the contrary. PWI cites several cases wherein the plaintiff claimed to have relied on the representations of the party with whom it was dealing at arm's length. For example, in *Central States Joint Bd. v. Continental Assurance Co.,* 117 Ill.App.3d 600, 73 Ill.Dec. 107, 453 N.E.2d 932 (1983), the plaintiff reached an insurance agreement with the defendant in which the defendant modified, at the plaintiff's request, certain provisions of a previous agreement between them. The defendant made the five changes requested by plaintiff but failed to notify the plaintiff of the retention of a provision, which plaintiff did not expressly request be deleted, that conflicted with the plaintiff's intention in the five changes. The plaintiff contended that such an omission was a fraudulent non-disclosure of a material term. The Illinois Appellate Court held that the plaintiff's reliance on the defendant's version of the insurance contract was unreasonable. There, like here, the plaintiff's agent failed to read the contract. But, that point was not and is not dispositive. The Appellate Court based its

decision on the fact that the plaintiff had ample opportunity and resources to investigate the contract at issue. The same, arguably, is true here. However, the *Central States* case is distinguishable, however. A decision in plaintiff's favor there would have permitted the plaintiff to assign its duty of due care to another, without the other agreeing to do so. The parties were dealing at arm's length. Here, in contrast, the Defendant essentially represented that reliance on it was due care, thereby accepting what would have been the Plaintiff's duty. PWI's representations regarding its expertise are sufficient bases for the Plaintiff to place its trust in PWI such that the Court must permit an exception to the general rule that a party may not rely on misrepresentations when the party has ample opportunity and resources to ascertain the truth. *See Commercial Nat'l Bank of Peoria v. F.D.I.C.*, 87 Ill.Dec. at 112, 476 N.E.2d at 814.

The case of *Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir.1987), provides a persuasive rational for permitting an exception here. There, the plaintiff made a loan to the defendant's brother-in-law, without knowing of the relation. As a condition to making the loan, the plaintiff required an attorney's letter stating that the brother-in-law's collateral was not impaired. The defendant, an attorney, wrote a letter so stating, without properly investigating the facts upon which the opinion letter was based. When the brother-in-law defaulted, the plaintiff learned that the collateral had been impaired. In affirming a judgment for plaintiff, the Seventh Circuit recognized that the plaintiff might have investigated the collateral's impairment on its own and that a failure to do so was arguably negligent. Rejecting that view, however, the Court explained that "Due care is the care that is optimal given that the other party is exercising due care." *Greycas, Inc.*, 826 F.2d at 1566. The law does not require potential tort victims to assume, beforehand, that the eventual tort feasors will be negli-

gent. *Id.* Otherwise, there would be an inefficient allocation of resources toward preventing torts. *See id.*

Here, as in *Greycas, Inc.*, the Plaintiff was entitled to expect the Defendant to use due care in evaluating the bonds. Unlike the *Central States* case perhaps, Plaintiff had no duty to expect that the Defendant would be negligent. Other cases cited by Defendant, *Seefeldt v. Millikin Nat'l Bank of Decatur*, 154 Ill.App.3d 715, 107 Ill.Dec. 161, 506 N.E.2d 1052 (1987) (affirming trial court's grant of summary judgment to real estate sellers where buyers were not entitled to rely on statements of sellers); *Costello v. Liberty Mut. Ins. Co.*, 38 Ill.App.3d 503, 348 N.E.2d 254 (1976) (reversing trial court decision permitting employee to sue former employer for fraud where employee said it relied on statements of employer that were easy for the employee to investigate), may similarly be distinguished. *Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill.App.3d 659, 152 Ill.Dec. 639, 566 N.E.2d 326 (1990). In neither case did the defendant undertake the obligation of providing the plaintiff with information which was otherwise available. Applying *Greycas, Inc.* to those cases, no inefficiency was created by requiring the plaintiff to do its own investigation. Here, in contrast, the Defendant deliberately undertook the obligation of providing the defendant with accurate information. Requiring the Plaintiff to do more investigation would have been inefficient.[3]

Accordingly, as to Count One, Defendant's Motion for Summary Judgment is denied.

### 3. Promissory Estoppel

■ In Count Two, Plaintiff seeks to recover on a promissory estoppel theory. To state a claim for promissory estoppel, a plaintiff must demonstrate: (1) that the defendant made an unambiguous promise; (2) that the plaintiff relied on the promise; (3) that such reliance was foreseeable; and (4) that the

---

3. Defendant cites two other cases that are also distinguishable. Both *Connor v. Merrill Lynch Realty, Inc.*, 220 Ill.App.3d 522, 163 Ill.Dec. 245, 581 N.E.2d 196 (1991); *appeal denied*, 143 Ill.2d 636, 167 Ill.Dec. 397, 587 N.E.2d 1012 (1992) (table), and *Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill.App.3d 659, 152 Ill.Dec.

639, 566 N.E.2d 326 (1990) support the proposition that a plaintiff cannot rely on a misrepresentation when the plaintiff has actual knowledge to the contrary. Here, there is no evidence that Plaintiff had actual knowledge that the bonds at issue were not authentic.

plaintiff relied to its detriment. *Quake Const., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990). As a matter of law, Plaintiff has failed to satisfy the first of these conditions.

■ Plaintiff correctly points out that a promise may either be express or implied. Here, Defendant made no express promise. The only implied promise that is arguably attributable to the Defendant is a promise to use due care in reviewing the bonds. Such a manufactured promise does not support a claim for promissory estoppel, however. It only supports a claim for negligent misrepresentation. To hold otherwise would permit plaintiffs to turn all sorts of torts into claims for promissory estoppel. Promissory estoppel is not a means for recasting negligence actions as actions for recovery on an implied promise to use due care.

■ Plaintiff does not create a "promise" by showing that the Defendant gave a professional opinion as to the bonds' authenticity. It is well settled that an opinion does not create a promise sufficient to give rise to a cause of action for estoppel. *See, e.g., Stringer Const. Co. v. Chicago Housing Authority*, 206 Ill.App.3d 250, 150 Ill.Dec. 692, 698, 563 N.E.2d 819, 825 (1990). Moreover, Plaintiff has failed to demonstrate the terms of any implied promise. It cannot, therefore, show an "unambiguous" promise.

Accordingly, as to Count Two, Defendant's motion for summary judgment is granted.

### 4. Breach of Fiduciary Duty

■ In Count Three, Plaintiff attempts to recast its claim as one for breach of fiduciary duty. Such a claim requires the establishment of fiduciary relationship. No such relationship existed between the Defendant and Plaintiff.

As a general rule: "If a person solicits another to trust him in matters in which he represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him, a fiduciary relation is established." *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir.1992). However, not every expert is a fiduciary. *Id.* A trusted expert does not become a fiduciary unless he gains "influence and superiority" over his advisee. *See id.; see also Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir.1992) (indicating, citing several cases, that in order to establish a fiduciary relationship, a plaintiff must show that it was subject to the defendant's domination, or influence and superiority). A relationship of trust between a plaintiff and defendant does not necessarily establish a fiduciary relationship. *See Pommier*, 967 F.2d at 1119; *Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg*, No. 93–C–1539, 1993 WL 266548 at *2 (N.D.Ill. July 15, 1993) (stating: "[I]n the absence of dominance and influence, there is no fiduciary relationship between the parties, no matter what the level of trust....").

As indicated in the Court's discussion of Count One, Plaintiff was entitled to "trust" Defendant to use reasonable care in evaluating the bonds. However, that level of trust does not, by itself, justify an action for breach of fiduciary duty. Plaintiff has failed to provide the Court with any evidence establishing an ongoing relationship exhibiting PWI's domination, influence, or superiority. Although PWI must be considered a fiduciary with respect to the Plan, no such relationship existed between PWI and CLC itself.

Citing *Martin v. Heinold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987), Plaintiff contends that PWI may be its fiduciary prior to CLC actually opening an account there. In *Martin*, the Illinois Supreme Court refused to conclude that "a fiduciary duty can never be imposed upon a prospective agent prior to the formal creation of an agency relationship." *Martin*, 109 Ill.Dec. at 777, 510 N.E.2d at 845. However, the Court did not elaborate on the circumstances where a fiduciary relationship would be deemed to exist. In the opinion of the Court, such is not the case here.

One could reasonably conclude that PWI solicited CLC's trust and held itself out as an expert with respect to CLC's bonds. One could also conclude that CLC trusted PWI and that PWI hoped to open an account for CLC. These conclusions do not mandate the

finding of a fiduciary relationship. Because Plaintiff has failed to produce evidence demonstrating PWI's domination or influence and superiority,[4] PWI's motion, with respect to this claim, is granted.

Accordingly, as to Count Three, Defendant's Motion for Summary Judgment is granted.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied as to Count One and granted as to Counts Two and Three.

4. In the opinion of the Court, Plaintiff does not establish "influence" merely because it accepted Defendant's advice.