In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-4026

R.J. O'BRIEN & ASSOCIATES, INC.,

*Plaintiff-Appellant,*

*v.*

RONALD FORMAN,

*Defendant-Third Party Plaintiff-Appellee,*

*v.*

CHRISTOPHER LONGWORTH, doing business as OZARK FUTURES & OPTIONS,

*Third Party Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 2711—**James T. Moody**, *Judge.*\*

ARGUED MAY 29, 2002—DECIDED JULY 29, 2002

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

---

\* Judge Moody, of the Northern District of Indiana, sitting by designation.

EVANS, *Circuit Judge*. At first glance, the verdicts in this case look inconsistent, so inconsistent, in fact, that both sides moved to have them set aside. And had this case been litigated differently, there is a chance—though far from a certainty—that we might have found them inconsistent. But as the case comes before us, we find that they are not. More than anything, the case is another illustration that the principles and rules by which the federal courts operate have teeth.

R.J. O'Brien and Associates, Inc. (RJO) is a futures commission merchant (FCM) that clears trades for commodity futures and options contracts on commodity exchanges such as the Chicago Mercantile Exchange and the Chicago Board of Trade. Christopher Longworth is an introducing broker who had a clearing and guarantee agreement with RJO. Ronald Forman is a Texas real estate developer who, in 1995, decided to enter the commodities market. His cousin introduced him to Longworth and, through Longworth, Forman opened an account with RJO. He signed a customer agreement which states in part:

> Customer understands that RJO will not be responsible for delays or inaccuracies in the electronic preparation of statements or the distribution of market information.

Further, the agreement states:

> Customer understands that RJO, among other requirements, is financially liable to the contract market clearing houses for debit balances occurring in the Customer's account. Because RJO is the guarantor to the clearing house, Customer agrees to hold RJO, its principals, officers, directors, employees, its affiliates and agents harmless with respect to any and all losses sustained by the latter resulting from the Customer's account, or any related activity, and to indemnify RJO for all costs incurred, including reasonable attorney's fees.

In commodities trading, speculators like Forman must pay what is a margin to the FCM when the contract is first entered. As time passes, it often becomes necessary for the speculator to make additional margin payments to cover payments that FCM would have to pay to the clearing houses to cover losses.

Forman's initial forays into the market were unsuccessful, and for a few months he dropped out of trading. But he reactivated his account with Longworth in April 1996. Then things really went south.

In the commodity futures market, the rules of the exchange establish trading limits which govern the amount of movement a particular commodity can sustain in any given day. At the time of Forman's trades, trading limits on corn were 12 cents or 18 cents a day. What this means is that the price of corn could not fluctuate either higher or lower than the limit amount from the prior day's closing figure. But immediately prior to the first day of the delivery month (May for May corn), there is a "first notice day," at which time there are no trading limits on a particular commodity and the price can fluctuate much higher or lower than the prior day's closing price.

At the close of the market on Friday, April 26, 1996, Forman's account had a market value of about $180,630, which he quite naturally wanted to protect. On Sunday, April 28, 1996, Forman called Longworth at home to discuss how to best protect his market position. Forman asked Longworth what the market limits would be on Monday, April 29, for May corn. Longworth said he did not know. He had not found out when Forman called him later that evening. Longworth said he would call RJO prior to the opening of trading on the 29th. In the morning, Longworth called RJO and was told that normal limits would apply, which Longworth thought would be 12 cents. He informed Forman, who promptly ordered an additional 250,000 bushels of May corn and 250,000 bushels of July corn.

As it turns out, April 29, 1996, was the first notice day for May corn. At about 10:15 in the morning, after Forman's order was placed, Longworth saw that the price for May corn had dropped below the 12 cent limit. At that point, Longworth again called RJO and was told that there were no limits on May corn that day. By 10:30, when Longworth called Forman, the price of May corn had dropped 17 to 18 cents below the Friday closing price. Forman was not happy about these developments and demanded that Longworth and RJO "fix it." He demanded reinstatement of the $180,630 he had in his account prior to the opening of the market.

At about 1 p.m., with the market having continued to fall throughout the day, Longworth informed Forman that he would be facing huge margin calls because the market had moved against his position. Forman told Longworth to sell the May corn; Longworth was able to sell 230,000 bushels of May corn by the end of trading that day. On April 30 the remaining May corn was sold. Forman still had the July corn, which also was moving against his position. Longworth informed Forman that he needed to deposit a $100,000 maintenance margin into his RJO account. Forman did not pay the margin. In a conference call with persons from RJO, Forman again refused to pay the $100,000 margin. When all was said and done after Forman failed to furnish the margin and his positions were liquidated, there was a net deficit in his account of $152,002.

RJO sued Forman for breach of contract and fraud to collect the deficit which occurred when Forman failed to meet margin calls. Forman counterclaimed and brought several third-party claims against Longworth and RJO. The case was tried to a jury, and the jury found, as relevant here, that Forman had breached the contract with RJO and awarded RJO compensatory damages of $152,002.10. The jury also found for Forman on his counter-

claims and third-party complaint against RJO and Longworth for negligent misrepresentation to the tune of $139,143.00.

The issue is, how can this be? How can both sides win? The answer supplied by the district judge is that the negligent misrepresentation and the breach of contract claims are entirely separate animals. The negligent representation grew, not out of the contract, but rather out of the common law duty owed by Longworth (and RJO because Longworth is its agent) to Forman. They were negligent in their failure to inform Forman that there were no limits on April 29th. The judge stated:

> The duty plaintiffs [a reference to RJO and Longworth] owed Forman to provide accurate information was an extra-contractual duty arising from the professional obligations plaintiffs owed their clients. *Congregation of the Passion v. Touche Ross & Co.*, 159 Ill. 2d 137, 636 N.E.2d 503, 514 (1994). Forman's duty to meet his margin call was a contractual duty. Consistent with the case *as it was argued and proved by the parties,* the jury could have concluded that despite his (ultimately correct) belief that he had been caused losses by plaintiffs' negligent advice, Forman nevertheless was contractually obligated to meet his margin call, and hash out later with plaintiffs whether their negligence led to the margin call in the first place. [Emphasis in original.]

We agree with this explanation, especially, as we shall see, with its emphasis on the manner in which the case "was argued and proved by the parties."

Yet RJO and Longworth profess to be stunned by the result. It runs counter, they say, to the well-established Illinois *Moorman* doctrine, the law of Illinois being the governing authority for the negligent misrepresentation claim. In *Moorman Manufacturing Co. v. National Tank*

*Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982), the Illinois Supreme Court set out its economic loss doctrine, barring tort recovery for economic losses. As with most doctrines, however, *Moorman* is subject to exceptions. An exception exists for instances in which the allegedly negligent party is in the "business of supplying information for the guidance of others . . . ." *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 165, 679 N.E.2d 1197, 1200 (1997). In such a case, the party can be sued for negligent misrepresentation. But because the Illinois courts have not established that introducing brokers like Longworth fall within the exception, it would be wrong, RJO and Longworth say, for the federal courts to say they do. Besides, at least in most instances, determination as to whether the exception applies requires a case-specific factual inquiry, citing *Continental Leavitt Communications, Ltd. v. PaineWebber, Inc.*, 857 F. Supp. 1266 (N.D. Ill. 1994). The jury here was not instructed that they had to find that Longworth was in the business of supplying information, as no request for an instruction of the sort was made on the record.

Recognizing that they have a waiver problem with the jury instruction, RJO and Longworth also argue that, in any case, the verdicts are inconsistent. They say that the verdict on the negligent misrepresentation claim should be set side, but, if not, both verdicts should be set aside and a new trial ordered. As they see it, the jury found that RJO was not responsible for the lost revenues and therefore it prevailed on the breach of contract claim, but the jury also found that it was responsible for the losses and thus awarded damages to Forman.

The entire appeal—viewed from any angle—depends on *Moorman* and its exceptions. *Moorman* dictates that, when a contract sets out the duties between the parties, recovery should be limited to contract damages, even though recovery in tort would otherwise be available under

the common law. *See Congregation of the Passion v. Touche Ross & Co.*, 159 Ill. 2d 137, 636 N.E.2d 503 (1994). The district judge's explanation of how the verdicts can be reconciled is correct only if there is a duty independent of the contract, which was owed by Longworth (and RJO, for whom Longworth was an agent), to not negligently represent the state of trading. Where does this duty come from? Under Illinois law, to exist it must be an exception to the *Moorman* doctrine. It depends on a finding that Longworth is in the "business of supplying information for the guidance of others." *Fireman's Fund*.

The problem RJO and Longworth face is that their claim that Longworth might not fit under the exception was not raised at trial. There was no objection to the jury instruction on negligent misrepresentation or to giving such an instruction in the first place. The case proceeded as if there was no problem with Forman's tort recovery theory. That is, in the district judge's words, the way the case "was argued and proved by the parties."

Perhaps sensing a grave problem with waiver, after their appeal was filed, RJO and Longworth moved the district court to supplement the record with affidavits from trial counsel setting out that they had, in fact, objected off the record to the negligent misrepresentation instruction as given. The affidavits did not set out the basis of that objection, and, especially in a situation such as this, only a specific objection stating that *Moorman* prevented the claim from proceeding would have been helpful. The district judge denied the motion to supplement, saying:

> A lengthy instruction conference was held on the record in this case, during which the parties' respective attorneys were given unlimited opportunity to make any and all objections they had to the court's instructions. It is the court's belief that if the objections at issue were not made during that instruction conference, they

were not made at all, and RJO and Longworth's motion to supplement the record would actually change the record to reflect events that did not occur.

Rule 51 of the Federal Rules of Civil Procedure could not be clearer. It says in part,

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Just recently, in *Chestnut v. Hall*, 284 F.3d 816 (7th Cir. 2002), we again pointed out that Federal Rule of Civil Procedure 51 requires not only that "objections to jury instructions be made in a timely fashion and on the record, but also with sufficient specificity to apprise the district court of the legal and factual bases for any perceived defect." We also reiterated that, unlike in a criminal trial, there is no plain error analysis in a civil trial.

That RJO and Longworth had every opportunity to object to the jury instructions and raise their concerns that Longworth did not fit into a *Moorman* exception is absolutely clear from the record. A discussion of jury instructions began near the end of the trial. At noon on August 29, 2001, the judge released the jury for a long lunch because the parties had to work on the instructions. At this time, counsel for RJO and Longworth moved to dismiss Forman's fraud claims and Forman voluntarily dismissed a common law fraud claim. Because the discussion of the instructions was not going as smoothly as the judge wanted, he sent the jury home that day to return the next morning, at the same time telling the lawyers he was "not asking you to work fast [on the instructions]. I want you to work right."

The next morning, an instruction conference was held on the record. Counsel for RJO and Longworth informed

the court that the parties agreed on everything but one issue regarding a fiduciary duty under the Commodities Exchange Act. Despite that degree of agreement, the judge went through the instructions one by one, asking as to each one whether there were any objections. When they reached instructions 32 and 33, which covered the negligent misrepresentation claim, counsel for RJO and Longworth asked for minor changes, which were made. But what is notable here, despite every opportunity, is that there was no questioning of the legal basis for the claim, as there had been in regard to the Commodities Exchange Act instruction. Similarly, there was no objection when the proposed verdict on the negligent misrepresentation count was discussed.

Therefore, the issue of error in the jury instruction is not before us, which means that the *Moorman* issue is not before us. The parties had an obligation to inform the judge at trial of their legal position on that claim. We will not make an end run around the failure to object to the jury instructions and find some way to reach the *Moorman* issue, for as we note, there is no equivalent civil "plain error" doctrine which applies in the trial of criminal cases. *National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001). Furthermore, if there were, we are not convinced that any error in giving the instruction was anything close to plain. Whether Longworth falls into a *Moorman* exception is a close question. What we have here, then, as far as we are concerned, is a jury properly instructed on negligent misrepresentation. Because of that, we have, as the district judge concluded, verdicts which can be reconciled with one another.

The other issue raised regarding RJO's entitlement to attorney fees under the contract depends on setting aside of the negligent misrepresentation verdict; therefore, we need not consider the issue. The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*